No. 22-30686

# United States Court of Appeals for the Fifth Circuit

DAMON LANDOR
*Plaintiff-Appellant,*

v.

LOUISIANA DEPARTMENT OF CORRECTIONS AND PUBLIC SAFETY; JAMES M. LE-BLANC, in his official capacity as Secretary thereof, and individually; RAYMOND LABORDE CORRECTIONAL CENTER; MARCUS MYERS, in his official capacity as Warden thereof, and individually; JOHN DOES 1-10; ABC ENTITIES 1-10,

*Defendants-Appellees*

Appeal from the United States District Court for the
Middle District of Louisiana, No. 3:21-cv-00733
The Honorable Shelly D. Dick, Chief Judge

## BRIEF FOR APPELLANT DAMON LANDOR

Casey Denson
CASEY DENSON LAW LLC
4601 Dryades Street
New Orleans, LA 70115
(504) 224-0110
cdenson@caseydensonlaw.com

Zachary D. Tripp
*Counsel of Record*
Joshua Halpern
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
zack.tripp@weil.com

Shai Berman
Sara Weiss
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Appellant Damon Landor*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1)    Plaintiff-Appellant:**

Damon Landor

**2)    Defendants-Appellees:**

Louisiana Department of Public Safety and Corrections

James M. LeBlanc

Marcus Myers

Raymond Laborde Correctional Center

**3)    Counsel for Plaintiff-Appellant:**

Zachary D. Tripp, Joshua Halpern, Shai Berman, and Sara Weiss, Weil, Gotshal & Manges LLP

Casey Denson, Casey Denson Law LLP

**4)    Counsel for Defendant-Appellee:**

Phyllis Esther Glazer and LaKeisha A. Ford, Louisiana Department of Justice, Office of Attorney General

/s/ Zachary D. Tripp

Zachary D. Tripp

*Attorney of Record for Appellant*
*Damon Landor*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Damon Landor respectfully requests oral argument. This appeal raises an important and recurring question regarding the interpretation of a federal statute. Oral argument would aid the Court's decisional process.

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................ i

Statement Regarding Oral Argument ................................................. iii

Introduction .......................................................................................... 1

Jurisdictional Statement ...................................................................... 3

Issues Presented .................................................................................. 4

Statement of the Case .......................................................................... 5

    A. Factual Background ..................................................................... 5

    B. Procedural History ....................................................................... 9

Summary of the Argument ................................................................ 10

Standard of Review ............................................................................ 14

Argument ............................................................................................ 15

    I.  RLUIPA authorizes monetary relief against prison officials in
their individual capacities ........................................................... 15

       A. The Supreme Court's decision in *Tanzin* confirms that
damages constitute "appropriate relief" in individual
capacity suits under RLUIPA ................................................ 16

          1.  Congress enacted both RFRA and RLUIPA to reinstate
the remedial landscape that existed prior to the
Supreme Court's decision in *Employment Division v.
Smith* ............................................................................. 16

          2.  *Tanzin* held that damages are appropriate in individual
capacity suits under RFRA .................................................. 19

          3.  *Tanzin* confirms that damages are clearly appropriate in
individual capacity suits under
RLUIPA ........................................................................... 23

          4.  The case for damages under RLUIPA is even stronger
than under RFRA ............................................................... 27

       B. *Tanzin* abrogates this court's contrary decision in *Sossamon* . 29

          1.  *Tanzin* confirms that *Sossamon* construed RLUIPA
incorrectly ....................................................................... 30

2. RLUIPA's authorization of money damages does not violate the Spending Clause ................................................... 33

II. Landor plausibly alleged that his RLUIPA rights were violated .. 42

Conclusion.................................................................................... 45

Certificate of Service..................................................................... 46

Certificate of Compliance ............................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Stephens,*
822 F.3d 776 (5th Cir. 2016) ................................................................ 42

*Ariyan, Inc. v. Sewerage & Water Bd.,*
29 F.4th 226 (5th Cir. 2022), *cert. denied,* No. 22-52, 2022 WL
9551015 (U.S. Oct. 17, 2022) ................................................................ 15

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................ 15

*Barbour v. Wash. Metro. Area Transit Auth.,*
374 F.3d 1161 (D.C. Cir. 2004) ................................................................ 36

*Barnes v. Gorman,*
536 U.S. 181 (2002) ................................................................ 41

*Bonvillian Marine Serv., Inc. v. Pellegrin,*
19 F.4th 787 (5th Cir. 2021) ................................................................ 15, 16, 29

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................................................ 2, 11, 18, 23, 43

*Carlson v. Green,*
446 U.S. 14 (1980) ................................................................ 37

*Charles v. Verhagen,*
348 F.3d 601 (7th Cir. 2003) ................................................................ 36

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ................................................................ 17, 21

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ................................................................ 25

*Clark v. Martinez,*
543 U.S. 371 (2005) ................................................................ 12, 30

*Coleman v. Lincoln Par. Det. Ctr.,*
858 F.3d 307 (5th Cir. 2017) ................................................................ 10

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
142 S. Ct. 1562 (2022) ................................................................ 40, 41

*Employment Div., Dep't of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990) ................................................................ *passim*

*Fountain v. Thaler,*
  629 F. App'x 592 (5th Cir. 2015)............................................................ 43

*Franklin v. Gwinnett Cnty. Pub. Schs.,*
  503 U.S. 60 (1992) ................................................................................... 24

*Gahagan v. USCIS,*
  911 F.3d 298 (5th Cir. 2018) ................................................................. 16

*Haight v. Thompson,*
  763 F.3d 554 (6th Cir. 2014) ................................................................. 29

*Heikkila v. Kelley,*
  776 F. App'x 927 (8th Cir. 2019)........................................................... 29

*Holt v. Hobbs,*
  574 U.S. 352 (2015)..................................................................... 17, 18, 42

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018)................................................................... 12, 30, 33

*Johnson v. Arteaga-Martinez,*
  142 S. Ct. 1827 (2022).......................................................................... 31, 33

*Jones v. Adm'rs of Tulane Educ. Fund,*
  51 F.4th 101 (5th Cir. 2022)................................................................. 14

*Larson v. Domestic & Foreign Com. Corp.,*
  337 U.S. 682 (1949)................................................................................ 36

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1,*
  469 U.S. 256 (1985)................................................................................ 39

*Madison v. Virginia,*
  474 F.3d 118 (4th Cir. 2006) ................................................................ 37

*McCulloch v. Maryland,*
  17 U.S. 316 (1819)................................................................................. 35

*Milon v. LeBlanc,*
  496 F. Supp. 3d 982 (M.D. La. 2020).................................................... 44

*Nelson v. Miller,*
  570 F.3d 868 (7th Cir. 2009) ................................................................ 29

*Odneal v. Pierce,*
  324 F. App'x 297 (5th Cir. 2009)........................................................... 43

*Rendelman v. Rouse,*
  569 F.3d 182 (4th Cir. 2009) ................................................................ 29

*Sabri v. United States,*
541 U.S. 600 (2004) ................................................................. *passim*

*Sharp v. Johnson,*
669 F.3d 144 (3d Cir. 2012) ................................................... 29

*Smith v. Allen,*
502 F.3d 1255 (11th Cir. 2007) .............................................. 29

*Smith v. City of Jackson,*
544 U.S. 228 (2005) ................................................................ 23

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004) ................................................................ 26

*Sossamon v. Texas,*
560 F.3d 316 (5th Cir. 2009) ............................................ *passim*

*Sossamon v. Texas (Sossamon II),*
563 U.S. 277 (2011) .................................................... 18, 23, 32

*South Dakota v. Dole,*
483 U.S. 203 (1987) ................................................................ 33

*Stewart v. Beach,*
701 F.3d 1322 (10th Cir. 2012) ............................................. 29

*Tanzin v. Tanvir,*
141 S. Ct. 486 (2020) ......................................................... *passim*

*The Emily & the Caroline,*
22 U.S. 381 (1824) ................................................................. 25

*United Motorcoach Ass'n, Inc. v. City of Austin,*
851 F.3d 489 (5th Cir. 2017) ................................................ 26

*United States v. Comstock,*
560 U.S. 126 (2010) ......................................................... 35, 36

*United States v. Lopez,*
514 U.S. 549 (1995) ................................................................ 38

*United States v. Tanksley,*
848 F.3d 347 (5th Cir. 2017) ........................................... 16, 29

*Ware v. Louisiana Department of Corrections,*
866 F.3d 263 (5th Cir. 2017) ............................................ *passim*

*Washington v. Gonyea,*
731 F.3d 143 (2d Cir. 2013) .................................................. 29

*White v. U.S. Corrections, L.L.C.*,
   996 F.3d 302 (5th Cir. 2021) ................................................................ 5

*Whitfield v. United States*,
   543 U.S. 209 (2005)............................................................................... 26

*Will v. Michigan Dep't of State Police*,
   491 U.S. 58 (1989) ................................................................................ 32

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) .............................................................................. 17

*Wood v. Yordy*,
   753 F.3d 899 (9th Cir. 2014) .............................................................. 29

*Yang v. Sturner*,
   728 F. Supp. 845 (D.R.I. 1990)........................................................... 21

*Yang v. Sturner*,
   750 F. Supp. 558 (D.R.I. 1990)........................................................... 21

**Statutes and Constitutional Provisions**

U.S. Const., Art. I, § 8, cl. 1............................................................... 33

U.S. Const., Art. I, § 8, cl. 18............................................................. 33

15 U.S.C. § 78u(d)(5)............................................................................ 22

18 U.S.C. § 666(a)(2) ..................................................................... 34, 40

18 U.S.C. § 666(b)................................................................................. 34

28 U.S.C. § 1291 ..................................................................................... 4

28 U.S.C. § 1331 ..................................................................................... 3

28 U.S.C. § 1343 ..................................................................................... 3

28 U.S.C. § 1367(a)................................................................................. 3

29 U.S.C. § 1132(a)(3) .......................................................................... 22

42 U.S.C. § 1983 .................................................................. 2, 4, 9, 18, 19

42 U.S.C. § 2000bb *et seq.*

   42 U.S.C. § 2000bb(b) ...................................................................... 17

   42 U.S.C. § 2000bb-1(c)................................................................... 18

   42 U.S.C. § 2000bb-2(1) ............................................................. 18, 31

   42 U.S.C. § 2000bb-2(1) (1994) ...................................................... 17

42 U.S.C. § 2000cc *et seq.*

42 U.S.C. § 2000cc-1(a) ....................................................... 14, 42

42 U.S.C. § 2000cc-2(a) ............................................................ 18

42 U.S.C. § 2000cc-2(f) ............................................................ 26

42 U.S.C. § 2000cc-3(g) ...................................................... 12, 27

42 U.S.C. § 2000cc-5(4) ...................................................... 18, 31

42 U.S.C. § 2000e-5(g)(1) ......................................................... 22

Pub. L. No. 106-274, § 7, 114 Stat. 803, 806 (2000) ................................. 24

## Other Authorities

146 Cong. Rec. 19123 (2000) ...................................................... 28

Becket Fund Amicus Br., *Tanzin v. Tanvir*
(No. 19-71 Feb. 12, 2020) ......................................................... 24

H.R. Rep. 106-219 (1999) ..................................................... 12, 28

*Religious Liberty: Hearing Before the S. Comm. On the Judiciary*,
106th Cong. 91 (1999) ............................................................ 28

*Religious Liberty Protection Act of 1999: Hearing on H.R. 1691
Before the Subcomm. on the Constitution of the H. Comm. on the
Judiciary*, 106th Cong. 111 (1999) ............................................... 28

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpreta-
tion of Legal Texts* (2012) .................................................... 19, 25

## INTRODUCTION

This case raises the question of whether RLUIPA authorizes money damages against state officials who violate prisoners' religious rights while acting in their individual capacities. The answer is yes, damages are available in such suits. In particular, the Supreme Court's recent decision in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), confirms that damages are available in individual-capacity suits and abrogates this Court's contrary decision in *Sossamon v. Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009), *aff'd on other grounds*, 563 U.S. 277 (2011).

In *Tanzin*, the Supreme Court held that the clear text of RLUIPA's sister statute—the Religious Freedom Restoration Act (RFRA)—authorizes money damages against officers in their individual capacities. 141 S. Ct. at 489. Damages must be available here as well. The text of RLUIPA's remedial provision is materially identical to RFRA's, as both use exactly the same reference to "appropriate relief" against a government official. Moreover, Congress enacted RFRA and RLUIPA for the same reason: To protect religious liberty by restoring the "compelling interest" test and remedial regime that existed before *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). And before *Smith*, a state prisoner whose religious rights were violated could have sought money damages in an individual-capacity suit under

1

42 U.S.C. § 1983 against the state official who perpetrated the violation. Because RLUIPA has "the same broad meaning" as RFRA, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 n.5 (2014), *Tanzin* restores the key remedy a state prisoner would have had before *Smith*: money damages in an individual-capacity suit against a state official.

*Tanzin*'s reasoning for holding that damages are "appropriate relief" under RFRA also applies *a fortiori* to RLUIPA. Not only do the text, history, context, and purpose of the statute all support that result, but damages are also "the *only* form of relief that can remedy some . . . violations" of religious freedoms. *Tanzin*, 141 S. Ct. at 492.

The facts alleged in this case vividly illustrate the point and highlight the practical need for damages. The plaintiff, Damon Landor, is a devout Rastafarian who spent nearly *two decades* growing his hair in dreadlocks as part of a sacred Nazarite vow. After two prisons in Louisiana accommodated Landor's religious beliefs, prison officials at a third facility to which he was transferred—the Raymond Laborde Correctional Center ("Laborde")—decided to have Landor handcuffed to a chair, forcibly restrained, and shaven completely bald. According to his complaint, Landor had told the relevant prison officials that his dreadlocks were a form of protected religious exercise. He even handed them a copy of this Court's decision in *Ware v. Louisiana Department of Corrections*, 866 F.3d 263 (5th Cir. 2017),

which held that the Louisiana Department of Corrections was prohibited under RLUIPA from applying its grooming policy to remove the dreadlocks of devout Rastafarians. *Id.* at 274. But the prison officials did not care: they threw this Court's decision away—both figuratively and literally—and subjected Landor to brazen physical and spiritual humiliation. ROA.17.

That was a grievous violation of RLUIPA. Multiple prisons in Louisiana had already accommodated Landor's religious exercise, and he was scheduled to be released in just three weeks' time. Yet, at the dawn of his release, prison officials at Laborde insisted upon humiliating him and burdening his religious exercise. In an instant, they desecrated a religious vow that Landor had scrupulously honored for decades. Damages are the only remedy that can even begin to remediate that violation—and they are plainly "appropriate" relief. It is damages or nothing. The statutory text is clear, but the district court believed that this Court's precedent stood in the way. Because *Sossamon* cannot be squared with the Supreme Court's textualist analysis in *Tanzin*, this Court should recognize that *Tanzin* abrogated and overruled *Sossamon*.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a) because Appellant Landor raised a federal claim under

the Civil Rights Act of 1871, 42 U.S.C. § 1983, a federal claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, and related state law claims. ROA.11. The district court dismissed all of Landor's claims and entered final judgment on September 29, 2022. ROA.219-24. Landor timely filed a notice of appeal on October 24, 2022. ROA.230. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether RLUIPA's express cause of action for "appropriate relief" against a state official who violates a prisoner's religious freedom authorizes an award of monetary relief against such an official acting in their individual capacity.

2.    Whether Landor sufficiently stated a claim that Defendants violated his rights under RLUIPA when they forcibly removed his dreadlocks in violation of his sincerely held religious beliefs.

## STATEMENT OF THE CASE

### A. Factual Background[1]

1.    Appellant Damon Landor is a devout Rastafarian who adheres to the Nazarite Vow. ROA.15. That ancient biblical oath traces back to Numbers 6:3-7, which commands the Nazarite to "let their hair grow long" in "dedication to the Lord." *Id*. For nearly twenty years, Landor honored that vow by growing dreadlocks down to his knees. ROA.15, 18, 48.

2.    Landor was incarcerated in the summer of 2020. ROA.16. During Landor's first five months of incarceration, he was held at two facilities— St. Tammany Parish Detention Center ("St. Tammany") and LaSalle Correctional Center ("LaSalle")—both of which allowed him to keep his dreadlocks as an expression of his faith. ROA.16-17. The prison officials at St. Tammany permitted Landor to wear his hair in a "rastacap" for the entirety of his stay—August 7, 2020 to September 21, 2020. ROA.16. After Landor was transferred to LaSalle, the prison voluntarily amended its grooming policy to permit Landor to keep his dreadlocks. ROA.16-17. In amending their policy, LaSalle stressed to Landor that the prison was confident that it could respect his religious beliefs while still "maintain[ing] a safe and secure environment" for prisoners and correctional staff. *Id*. That

---

[1] The facts included in this section are drawn from the well-pleaded allegations in the complaint, which this Court must assume are true. *White v. U.S. Corrections, L.L.C.*, 996 F.3d 302, 306-07 (5th Cir. 2021).

amendment brought LaSalle into alignment with the overwhelming majority of jurisdictions in the United States, which allow the wearing of dreadlocks for religious purposes while a person is incarcerated. *See Ware*, 866 F.3d at 273.

With only three weeks until his release, however, Landor was transferred to Laborde. ROA.16, 17, 19. The transfer immediately turned into a nightmare.

On December 28, 2020, the day that Landor was transferred to Laborde, he had an intake interview with a guard. ROA.17. During the interview, Landor explained that he was a Rastafarian and that his dreadlocks constituted a protected form of religious expression. *Id*. Landor furnished several "federal and state forms" establishing his right to a religious accommodation. *Id*. And he handed the guard a copy of this Court's decision in *Ware*, which held that the Department of Corrections' grooming policy against dreadlocks violates RLUIPA when applied to devout Rastafarians, 866 F.3d at 274. ROA.17.

The guard's response was chilling: He turned around and threw away this Court's printed decision, ROA.17, before summoning the warden, Defendant Marcus Myers, to "interrogate Plaintiff about his religious beliefs," ROA.18. Warden Myers asked Landor to provide "documentation . . . from the sentencing judge" showing that his dreadlocks were indeed

an expression of his faith. ROA.18. Landor explained that he had no such documentation, but that he could easily contact his attorney to obtain the requested documents. *Id.*

The Warden gave Landor no such opportunity. He decided it was "[t]oo late for that." *Id.* He directed prison guards to move Landor to a separate room. *Id.* There, they shackled Landor to a chair, pinned him down, and had him shaven completely bald. ROA.18, 28, 30-31.

The below photos depict Mr. Landor before and after the incident:

AUGUST 3, 2020



DECEMBER 28, 2020



ROA.46, 48 (Exhibits A and B, offering "before" and "after" photos). Several feet of dreadlocks, which Landor had grown over the span of decades, were gone in an instant.

Landor was then punished for his refusal to violate his religious beliefs. He was placed in lockdown, where he remained for the next three weeks until his release on January 20, 2021. ROA.19. Each day that he was in lockdown, Landor requested a grievance form so that he could file a complaint. The prison refused. *Id.*

### B. Procedural History

On December 27, 2021, Landor filed a complaint in the U.S. District Court for Middle District of Louisiana, asserting claims under 42 U.S.C. § 1983, for violations of his First, Eighth, and Fourteenth Amendment rights, and under RLUIPA. ROA.11, 19-39. Landor also brought related state law claims for negligence, intentional infliction of emotional distress, and violations of the Louisiana State Constitution. ROA.11, 39-42. He sought injunctive, declaratory, and monetary relief against the Louisiana Department of Public Safety and Corrections and Laborde, as well as the individual defendants, Marcus Myer and James LeBlanc,[2] in their official and individual capacities. ROA.11, 43.

In April 2022, Defendants moved to dismiss Landor's complaint. ROA.121-22. The individual defendants, LeBlanc and Myers, argued that Landor's RLUIPA claim against them failed because the statute does not authorize individual-capacity claims for money damages and Landor's "release from prison" mooted any request for "equitable relief." ROA.127-29 (citation omitted).

---

[2] Landor also reserved the right to amend his complaint to sue unnamed John Does, who violated Landor's rights but whose identities are still unknown, after discovery. *See* ROA.13. The individuals who likely fall into this category are the prison guard who conducted Landor's initial intake and the two prison officials that forcibly restrained Landor while his dreadlocks were removed.

The district court agreed and dismissed Landor's complaint in full. ROA.219, 222-23. The court acknowledged that Landor was proceeding *pro se* with substantial allegations of wrongdoing. ROA.217-18. But the district court believed that Fifth Circuit precedent denied Landor any meaningful relief: Specifically, RLUIPA "does not authorize a private cause of action for . . . damages," and Landor's release from prison mooted his request for declaratory and injunctive relief. ROA.219 (quoting *Coleman v. Lincoln Par. Det. Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017), which relied upon *Sossamon*, 560 F.3d at 326-31). The district court dismissed Landor's First Amendment claim under a lower standard than the one Congress codified in RLUIPA, it dismissed Landor's other constitutional claims as dependent on the First Amendment claim, and it declined to exercise supplemental jurisdiction over the related state law claims. ROA.219-23. The district court then entered judgment in favor of Defendants. ROA.224.

Landor timely appealed. ROA.230.

## SUMMARY OF THE ARGUMENT

I. RLUIPA authorizes a state prisoner to obtain money damages against a state official who, acting in his or her individual capacity, vio-

lates the prisoner's religious rights. The Supreme Court's decision in *Tanzin* abrogates this Court's prior precedent in *Sossamon* and in turn forecloses the district court's holding barring monetary relief.

*Tanzin* relied on RFRA's text, context, history, and purpose to hold that it provides a damages remedy against federal officials acting in their individual capacities. The Court explained that damages are "appropriate relief" under RFRA because: (1) RFRA was enacted to restore the pre-*Smith* remedial regime, under which it was well established that damages could be awarded in individual-capacity suits against officers; (2) damages are often the "*only* form of relief that can remedy some RFRA violations"; and (3) unlike other statutes, Congress did not explicitly foreclose damages as an available remedy. *Tanzin*, 141 S. Ct. at 491-92.

The text, context, history, and purpose of RLUIPA are materially identical, and all three textual reasons for why the Supreme Court held that damages were "appropriate" under RFRA apply with equal force to RLUIPA. Because the Supreme Court has consistently "given" RLUIPA and RFRA "the same broad meaning," *Hobby Lobby*, 573 U.S. at 696 n.5, *Tanzin* dictates that RLUIPA's materially identical remedial provision be read to permit damages suits against state officers in their individual capacities. If anything, the case for damages under RLUIPA is even

11

stronger: RLUIPA mandates that it be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution," 42 U.S.C. § 2000cc-3(g), and the committee report supporting RLUIPA expressly states that RLUIPA's private cause of action would include a damages remedy, H.R. Rep. 106-219, at 2, 29 (1999).

*Tanzin* overrules this Court's contrary decision in *Sossamon*. The panel that decided *Sossamon* did not square its conclusions with the statutory text; rather, the Court invoked constitutional avoidance over concerns that RLUIPA's remedial provision would exceed Congress's power under the Spending Clause if construed to impose individual-capacity liability on state officers, because the officers are not themselves direct recipients of federal funds. 560 F.3d at 328-29. In *Tanzin*, however, the Supreme Court found that RFRA's materially identical text "clear[ly]" allows for individual-capacity suits. 141 S. Ct. at 490. And in the absence of an alternative, plausible construction, constitutional avoidance is inapplicable and the logic of *Sossamon* collapses on itself. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005); *Jennings v. Rodriguez*, 138 S. Ct. 830, 836, 842 (2018).

In any event, *Sossamon*'s constitutional concerns are misplaced. This Court expressed general federalism-based concerns about whether Congress could use Spending Clause legislation to impose liability on a non-

recipient of federal funds. *Sossamon*, 560 F.3d at 328-39. But *Sossamon* expressly equivocated in its conclusion: It acknowledged that the prisoner's constitutional argument was woefully under-briefed, and that a damages remedy might well be consistent with the Spending Clause under theories that the plaintiff had simply failed to press. Specifically, the Court recognized that individual capacity damages might be consistent with the Spending Clause because the "state official becomes a third-party beneficiary . . . or knowingly and voluntarily subjects himself to liability" by "accepting employment in a federally funded state enterprise," but declined to consider that argument because the plaintiff "d[id] not make [it]." *Id.* at 329 n.36.

That equivocation was prescient—because the briefing in that case did not provide this Court an opportunity to consider the Supreme Court decision most squarely on point. In *Sabri v. United States*, 541 U.S. 600 (2004), the Supreme Court held that Congress possesses the authority under the Spending Clause, coupled with the Necessary and Proper Clause, to impose liability on non-recipients of federal funds. *See id.* at 602-08. And under *Sabri*'s framework, the imposition of individual liability under RLUIPA upon a third-party beneficiary, like a state employee, is constitutional. If things were otherwise, Congress's express condition attached to the receipt of federal funds would be largely toothless, as the officers and

agents of a grant recipient could simply ignore Congress's command and, in many cases, no remedy would be available to the victim.

Accordingly, *Tanzin* abrogates *Sossamon* and instructs that RLUIPA provides a damages remedy in individual-capacity suits against state officers who violate an inmate's religious rights.

II. This Court therefore should vacate the judgment below and remand for further proceedings. Landor's complaint plausibly pleads a grievous violation of RLUIPA and this Court's binding precedents. In *Ware*, this Court held that the Louisiana Department of Corrections was prohibited under RLUIPA from applying its grooming policy to remove the dreadlocks of devout Rastafarians. 866 F.3d at 274. The Court held that the purported security "interests served by the grooming policies are not truly compelling," and that the blanket ban on dreadlocks is not "the least restrictive means of serving any such interest." *Id.* at 271, 274. Defendants thus imposed "a substantial [and unjustified] burden on [Landor's] religious exercise," 42 U.S.C. § 2000cc-1(a), when they shaved his head in express violation of his sincere religious beliefs and this Court's holding in *Ware*.

## STANDARD OF REVIEW

This Court reviews a district court's dismissal for failure to state a claim *de novo*. *Jones v. Adm'rs of Tulane Educ. Fund*, 51 F.4th 101, 109

(5th Cir. 2022). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted). The Court "accept[s] all well-pleaded facts as true and view[s] those facts in the light most favorable to the plaintiff." *Ariyan, Inc. v. Sewerage & Water Bd.*, 29 F.4th 226, 229 (5th Cir. 2022), *cert. denied*, No. 22-52, 2022 WL 9551015 (U.S. Oct. 17, 2022).

## ARGUMENT

### I.    RLUIPA Authorizes Monetary Relief Against Prison Officials in Their Individual Capacities

The district court erred in following this Court's decision in *Sossamon*, which held that RLUIPA does not permit "individual-capacity claims" for money damages. 560 F.3d at 327-29. *Sossamon* was decided more than a decade ago and without the benefit of the Supreme Court's intervening decision in *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020). This Court "has both 'the authority and *obligation* to declare and implement [a] change in the law'" when prior precedent becomes "out of step with some intervening change in the law." *Bonvillian Marine Serv., Inc. v. Pellegrin*, 19 F.4th 787, 792 & n.5 (5th Cir. 2021) (quoting *United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir. 2017)). *Tanzin* constitutes such a change: *Tanzin* held that RFRA's *identically worded* remedial provision authorizes money damages against officers in their individual capacities. 141 S. Ct.

at 489. *Tanzin* thus "implicitly" overruled this Court's decision in *Sossamon* by "establish[ing] a rule of law inconsistent with" *Sossamon*'s fundamental logic. *Bonvillian*, 19 F.4th at 792 (citation omitted).

"That [the] two decisions involve different statutes is not dispositive"—for, even a Supreme Court decision involving a different statute may overrule Fifth Circuit "precedent involving another statute," whenever the "issues decided" are sufficiently "similar[]." *Gahagan v. USCIS*, 911 F.3d 298, 302-03 (5th Cir. 2018). Here, the remedial provisions of RFRA and RLUIPA are more than merely "similar," they are *identical*. Because *Sossamon*'s reliance on constitutional avoidance is inconsistent with *Tanzin*'s plain-text analysis, this Court's prior decision has been implicitly overruled.

## A. The Supreme Court's Decision in *Tanzin* Confirms That Damages Constitute "Appropriate Relief" in Individual Capacity Suits Under RLUIPA

### 1. Congress Enacted Both RFRA and RLUIPA to Reinstate the Remedial Landscape That Existed Prior to the Supreme Court's Decision in *Employment Division v. Smith*

Congress enacted both RFRA and RLUIPA in reaction to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. at 885-90. In *Smith*, the Court held for the first time that "the First Amendment tolerates neutral, generally applicable laws that burden or prohibit religious acts even when the laws are unsupported by a narrowly tailored,

compelling governmental interest." *Tanzin*, 141 S. Ct. at 489. *Smith* effected a significant shift in the Supreme Court's free exercise jurisprudence. In prior cases, such as *Wisconsin v. Yoder*, 406 U.S. 205, 215, 220-21 (1972), the Supreme Court had recognized that the Free Exercise Clause may sometimes compel individualized exemptions from a neutral and generally applicable law, whenever necessary to alleviate a "substantial burden" on religion.

Congress overwhelmingly preferred that pre-*Smith* regime, and it quickly "sought to counter" *Smith*'s practical effects with bipartisan legislation. *Tanzin*, 141 S. Ct. at 489. First through RFRA, and later through RLUIPA, Congress restored the pre-*Smith* standard by "provid[ing] a claim . . . to persons whose religious exercise is substantially burdened by government." *Id.* (alteration and omission in original) (quoting 42 U.S.C. §§ 2000bb(b)(1)-(2)). As originally enacted, RFRA covered both state and federal government officials. 42 U.S.C. § 2000bb-2(1) (1994). In *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997), however, the Supreme Court invalidated RFRA's state applications as exceeding Congress's powers under the Fourteenth Amendment.

Congress responded "by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional authority under the Spending and Commerce Clauses." *Holt v. Hobbs*, 574 U.S. 352, 357

(2015). After RFRA, "RLUIPA is Congress' *second attempt* to accord heightened statutory protection to religious exercise in the wake of this Court's decision in [*Smith*]." *Sossamon v. Texas* (*Sossamon II*), 563 U.S. 277, 281 (2011) (emphasis added). Both provisions were designed to re-store all of the "protections and rights" that were previously available to free-exercise plaintiffs under the pre-*Smith* regime—including money damages for individual-capacity suits, which had previously been availa-ble under 42 U.S.C. § 1983. *Tanzin*, 141 S. Ct. at 492. Though RLUIPA has a "less sweeping" scope than RFRA (*i.e.*, it applies only to land issues and institutionalized persons), *Sossamon II*, 563 U.S. at 281, its rights-creating language still "mirrors RFRA" in all relevant respects, *Holt*, 574 U.S. at 357-58, and the substantive provisions of the two statutes have always been "given the same broad meaning," *Hobby Lobby*, 573 U.S. at 696 n.5.

Most significant here, the remedial clauses of the two statutes are materially identical: A person may "obtain appropriate relief against a government," 42 U.S.C. § 2000bb-1(c); *id.* § 2000cc-2(a), and "government" is defined to include an "official" and any "other person acting under color of State law," *id.* § 2000bb-2(1); *id.* § 2000cc-5(4); *compare* 42 U.S.C. § 1983. The question in this case is whether that language authorizes damages in individual-capacity suits under RLUIPA. It does.

### 2. *Tanzin* Held That Damages Are Appropriate in Individual Capacity Suits Under RFRA

In *Tanzin*, the Supreme Court interpreted the phrase "appropriate relief against a government," as it appears in RFRA, to authorize claims for money damages against federal officials acting in their individual capacities. The Court held, first, that RFRA's text "clear[ly]" allows for individual-capacity suits. *Tanzin*, 141 S. Ct. at 490. The phrase "persons acting under color of law," the Court explained, "draws on one of the most well-known civil rights statutes: 42 U.S.C. § 1983," which had long been understood "to permit suits against officials in their individual capacities" for money damages. *Id.* "Because RFRA uses the same terminology as § 1983 in the very same field of civil rights law," the Court interpreted the two statutes to "'bear[] a consistent meaning'" in authorizing individual capacity suits. *Id.* at 490-91 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 323 (2012)).

Next, *Tanzin* turned to the question of whether damages constitute "appropriate relief" in such suits. The Court answered that question in the affirmative, and solely by reference to the "phrase's plain meaning at the time of enactment." *Id.* at 491. The Court, in its analysis, made three textual points that bear heavily on this appeal:

*First,* though the meaning of the phrase "appropriate relief" is "inherently context dependent," the Court stressed that "damages have long

been awarded as appropriate relief" "[i]n the context of suits against Government officials" in their individual capacities. *Id.* (citation and internal quotation marks omitted). As *Tanzin* explains, damages were "commonly available against state and local government officials" under Section 1983 when RFRA was enacted. *Id.* at 491-92. Hence, prior to the Supreme Court's decision in *Smith*, free-exercise plaintiffs could sue state officials for damages under Section 1983 whenever their religious exercise was substantially burdened. *Id.* Because Congress enacted RFRA to reverse the effects of *Smith* and restore that full remedial landscape, *Tanzin* explains, Congress "at the time of [the statute's] enactment" would have understood money damages to constitute "appropriate relief" in individual capacity suits. *Id.* "Given that RFRA reinstated pre-*Smith* protections and rights, parties suing under RFRA must have at least the same avenues for relief against officials that they would have had before *Smith*. That means RFRA provides, as one avenue for relief, a right to seek damages against Government employees." *Id.* at 492.

*Second, Tanzin* stressed that damages must be "appropriate" because they are the "*only* form of relief that can remedy some RFRA violations." *Id.* at 492. To illustrate the problem, the Supreme Court cited the infamous case of *Yang v. Sturner*, in which a medical examiner performed an

autopsy on a young Hmong man without notice to his family and in violation of their religious beliefs. 728 F. Supp. 845, 846, 856 (D.R.I. 1990). The Yang family sued for damages—because an injunction would have done nothing to remedy the past harm to the body. *See id.* at 847, 850-51. The district court in that case originally held, under the pre-*Smith* free-exercise standard, that the family's damages case against the examiner could proceed. *Id.* at 855-57. Then, the Supreme Court decided *Smith*, leading the district court to reverse itself because the statute authorizing the autopsy was a generally applicable law. *Yang v. Sturner*, 750 F. Supp. 558, 559-60 (D.R.I. 1990).

Congress enacted RFRA specifically in response to cases like *Yang*, in which *Smith* left free-exercise plaintiffs without a remedy. *City of Boerne*, 521 U.S. at 530-31 ("Much of the discussion" about the need for RFRA "centered upon anecdotal evidence of autopsies performed on Jewish individuals and Hmong immigrants in violation of their religious beliefs."); *Tanzin*, 141 S. Ct. at 492. In cases like those, where the body had already been defiled, damages offered the "*only* form of relief" available to remediate the violation. *Tanzin*, 141 S. Ct. at 492. *Tanzin* thus teaches that it would be "odd to construe" the phrase "appropriate relief" to preclude all

meaningful relief for plaintiffs like the Yangs, given that RFRA was specifically enacted to undo *Smith's* practical effects in precisely those sorts of cases. *Id.*

*Third*, and finally, *Tanzin* explained that Congress "knew how to" foreclose damages for plaintiffs like the Yangs (or Landor), if that was indeed Congress's intention. *Id.* Congress, for example, could have restricted RFRA's remedial language to provide only "appropriate *equitable* relief," 29 U.S.C. § 1132(a)(3) (emphasis added), or "any *equitable* relief that may be appropriate or necessary," 15 U.S.C. § 78u(d)(5) (emphasis added), or "*equitable* relief as the court deems appropriate," 42 U.S.C. § 2000e-5(g)(1) (emphasis added). But Congress declined to limit available remedies in that way. Instead, Congress chose the broader formulation "appropriate relief," with the stated aim of restoring the pre-*Smith* remedial scheme that had developed under Section 1983—including damages. *Tanzin*, 141 S. Ct. at 491-93.

*Tanzin* was thus a straightforward case of statutory interpretation: A unanimous Supreme Court concluded, based on the statutory context and all of the relevant "textual cues," that RFRA's "plain meaning at the time of enactment" authorized individual-capacity suits for money damages. *Id.* at 491-92.

### 3. *Tanzin* Confirms That Damages Are Clearly Appropriate in Individual Capacity Suits Under RLUIPA

This Court should interpret the remedial language in RLUIPA the same way as in RFRA: to provide money damages against officers acting in their individual capacities. The two statutes use the same language to achieve an identical end and have consistently been "given the same broad meaning." *Hobby Lobby*, 573 U.S. at 696 n.5; *compare Sossamon II*, 563 U.S. at 289 n.6. "[W]hen Congress uses the same language in two statutes having similar purposes," as is the case here, "it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). Hence, if individual capacity suits are permitted and damages are "appropriate relief" under RFRA, then the same must be true under RLUIPA's identically worded remedial provision.

Moreover, each of *Tanzin*'s three textual arguments apply with equal, if not greater, force to RLUIPA, making the textual case for damages under RLUIPA even stronger than under RFRA:

*First,* consider the textual link between RLUIPA and Section 1983. Like RFRA, RLUIPA uses Section 1983's central phrase "persons acting under color of law." *Tanzin*, 141 S. Ct. at 490. And also like RFRA, RLUIPA was enacted to "reinstate[] pre-*Smith* protections and rights" available to plaintiffs bringing suit under Section 1983. *Id.* at 492. But

Congress amended RFRA in 2000 so that it would apply *only* to the federal government, and not to state officials. Pub. L. No. 106-274, § 7, 114 Stat. 803, 806 (2000). By contrast, RLUIPA granted rights specifically and exclusively against *state and local officials* who substantially burden religion—exactly as Section 1983 would have done in the pre-*Smith* world.

That airtight connection between RLUIPA and Section 1983 means that damages must also be available in individual capacity suits. If Section 1983 establishes a baseline of "appropriate relief" against federal officials under RFRA, then *a fortiori* it must do the same for suits against state officials under RLUIPA's identically worded remedial provision, which is specifically trained at state officers. *Tanzin*, 141 S. Ct. at 491-92.

*Second,* damages must be "appropriate" relief under RLUIPA because they are often the "*only* form of relief that can remedy some [RLUIPA] violations." *Id.* at 492; *see Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 73, 75-76 (1992) (explaining that "appropriate relief" extends beyond equitable remedies whenever "prospective relief accords [the victim] no remedy at all"). For institutionalized persons in particular, it will often be damages or nothing, because a prisoner's release or transfer (or even death) will typically moot out a claim for injunctive relief before it ever becomes ripe for judicial decision. *See* Becket Fund Amicus Br. 12-14, *Tanzin v. Tanvir* (No. 19-71 Feb. 12, 2020) (problem of "strategic mootness" by

defendants is "particularly true in the prison context"). And injunctive relief is further unavailable if a past deprivation of religious freedoms—no matter how egregious or harmful—is insufficiently likely to recur. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-11 (1983).

Accordingly, if RLUIPA were to authorize only injunctive relief, many RLUIPA plaintiffs would be denied *any* opportunity for relief, and the officers and agents of a state or local prison that accepts federal funding could easily evade RLUIPA's central command of religious accommodation that is attached as an express condition to receiving that funding. *See* Scalia & Garner, *Reading Law*, at 64 (explaining that constructions that would "render[] the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner" are disfavored (quoting *The Emily & the Caroline*, 22 U.S. 381, 389 (1824)).

This case illustrates the point perfectly. In *Ware*, this Court held that the Louisiana Department of Corrections' policy against dreadlocks violates RLUIPA, and that Louisiana prisons were affirmatively required to accommodate the religious exercise of Mr. Ware, a devout Rastafarian. 866 F.3d at 274. Yet, three short years later, prison officials treated that decision as nothing more than piece of paper—they threw it away, handcuffed Landor to chair, and shaved him completely bald. ROA.17-19. In an instant, the prison officials upended nearly *twenty years* of religious exercise,

and there is nothing that an after-the-fact injunction could do to remediate that harm. As this case makes clear, *Sossamon*'s rule against damages defeats RLUIPA's unambiguous objectives by absolving defendants of any real accountability and denying the victim any relief at all. That is wrong. For Landor, like the Yang family before him, damages must be "appropriate relief" because they are literally the "*only* form of relief" that can ever possibly vindicate his free-exercise rights. *Tanzin*, 141 S. Ct. at 492.

*Third,* Congress could have drafted RLUIPA to foreclose damages— the only colorable form of relief in such cases—by limiting available remedies to include only "appropriate *equitable* relief." *Supra* p. 21; *see also Whitfield v. United States*, 543 U.S. 209, 216 (2005). Indeed, Congress did so elsewhere in RLUIPA itself: Congress specifically authorized the United States to "bring an action for injunctive or declaratory relief," *but not damages*, "to enforce compliance with [RLUIPA]." 42 U.S.C. § 2000cc-2(f). Congress's choice to limit the United States' remedy, but not the prisoner's remedy, must be taken as deliberate. "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted). "[D]isparate usage requires different meanings," especially in the same statute. *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 495 (5th Cir. 2017).

Congress's use of the broader formulation "appropriate relief" is thus properly understood to authorize money damages as they existed under the pre-*Smith* remedial landscape.

### 4. The Case for Damages Under RLUIPA Is Even Stronger Than Under RFRA

The case for damages under RLUIPA is even stronger than it was in *Tanzin* because Congress embedded in RLUIPA's text and history additional cues confirming that damages are "appropriate relief" in individual capacity suits.

*First*, Congress added a new provision into RLUIPA that confirms that plaintiffs must be afforded the opportunity to secure meaningful relief. Specifically, unlike RFRA, RLUIPA provides that it "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). Congress's inclusion of this maximalist mandate eliminates any doubt as to the scope of RLUIPA's protections and confirms that Congress intended to make the same remedies that were available before *Smith*—including money damages—available once again under RLUIPA.

*Second*, before RLUIPA's enactment, the House Committee on the Judiciary was unequivocal that the text would "creat[e] a private cause of

action for damages" in "suits against state officials and employees," without also "abrogat[ing] the Eleventh Amendment immunity of states." H.R. Rep. 106-219, at 2, 29 (1999). The section-by-section analysis of RLUIPA was in accord. 146 Cong. Rec. 19123 (2000). In addition, Professor Douglas Laycock—a leading scholar on remedies and religious liberty—testified to Congress that "[a]ppropriate relief includes declaratory judgments, injunctions, *and damages*" against officials in their individual capacities. *Religious Liberty Protection Act of 1999: Hearing on H.R. 1691 Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 106th Cong. 111 (1999) (statement of Douglas Laycock, Professor, University of Texas Law School) (emphasis added).[3]

While all of this history *postdates* RFRA by at least six years, it *predates* RLUIPA and thus provides yet more support for interpreting RLUIPA to allow for a damages remedy against state officials.

* * *

In sum. the Supreme Court held in *Tanzin* that RFRA's identically worded remedial provision authorizes damages. And all of *Tanzin*'s arguments apply with equal, if not greater, force to RLUIPA. What is more,

---

[3] *See also Religious Liberty: Hearing Before the S. Comm. On the Judiciary*, 106th Cong. 91 (1999) (statement of Douglas Laycock, Professor, University of Texas Law School).

Congress in RLUIPA included additional textual cues that confirm that damages may be awarded in individual capacity suits.

### B. *Tanzin* Abrogates This Court's Contrary Decision in *Sossamon*

This Court in *Sossamon*, 560 F.3d at 327-29, held that RLUIPA does not authorize damages against state officials in their individual capacities.[4] But *Sossamon* was decided over a decade before *Tanzin*, and this Court "has both 'the authority and obligation to declare and implement [the] change in the law'" that *Tanzin* compels. *Bonvillian Marine*, 19 F.4th at 792 (quoting *Tanksley*, 848 F.3d at 350). *Sossamon* did not analyze the original public meaning of RLUIPA's remedial provisions in their full statutory and historical context—as the Supreme Court did with RFRA's materially identical provisions in *Tanzin*. Instead, the *Sossamon* Court "decline[d] to read" RLUIPA "as permitting suits against RLUIPA defendants in their individual capacities" in order "to *avoid* . . . constitutional concerns." 560 F.3d at 329 (emphasis added). Because *Tanzin*'s plain-text and

---

[4] Before *Tanzin*, other circuits had reached the same result. *See Washington v. Gonyea*, 731 F.3d 143, 145-46 (2d Cir. 2013); *Sharp v. Johnson*, 669 F.3d 144, 153-55 (3d Cir. 2012); *Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009); *Haight v. Thompson*, 763 F.3d 554, 567-70 (6th Cir. 2014); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009); *Wood v. Yordy*, 753 F.3d 899, 902-04 (9th Cir. 2014); *Stewart v. Beach*, 701 F.3d 1322, 1333-35 (10th Cir. 2012); *Smith v. Allen*, 502 F.3d 1255, 1271-75 (11th Cir. 2007), *overruled on other grounds by*, *Hoever v. Marks*, 993 F.3d 1353 (11th Cir. 2021); *see also Heikkila v. Kelley*, 776 F. App'x 927, 928 (8th Cir. 2019).

historical analysis conflicts with *Sossamon*'s atextual construction, and because *Sossamon*'s constitutional concerns were misplaced in any event, this Court should formally recognize that *Sossamon* has been overruled.

### 1. *Tanzin* Confirms that *Sossamon* Construed RLUIPA Incorrectly

This Court in *Sossamon* held that RLUIPA does not authorize damages against officials in their individual capacities. 560 F.3d at 329. *Sossamon* recognized that "[t]he plain language of RLUIPA . . . seems to contemplate" "damages from individuals." *Id.* at 327. Still, *Sossamon* worried that such a "reading would entail" "constitutional concerns" regarding whether "Congress's Spending Clause power" gives it license to extend liability to non-recipients of the granted funds. *Id.* at 328-29. Thus, *Sossamon* "decline[d] to read" RLUIPA "as permitting suits against RLUIPA defendants in their individual capacities" in order "to avoid [its] constitutional concerns." *Id.* at 329.

*Sossamon*'s atextual approach cannot survive the Supreme Court's intervening decision in *Tanzin*. Constitutional avoidance is "a tool for choosing between competing *plausible* interpretations of a statutory text." *Clark*, 543 U.S. at 381 (emphasis added). "In the absence of more than one plausible construction, the canon simply 'has no application.'" *Jennings*, 138 S. Ct. at 842 (citation omitted). In this case, "ordinary textual analysis"

precludes application of constitutional avoidance. *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022).

*Tanzin* confirms that there is no ambiguity as to whether money damages are available against officers in their individual capacities. In the Supreme Court's words, the text provides a "clear answer" that "injured parties can sue Government officials in their personal capacities" under the statute's definition of the term "government." *Tanzin*, 141 S. Ct. at 490; *see also* 42 U.S.C. § 2000bb-2(1); *id.* § 2000cc-5(4). That alone suffices to overrule *Sossamon*, which expressly "assume[d] that if RLUIPA creates an action against defendants in their individual capacities, then it provides for damages." 560 F.3d at 327. And if that was not enough, *Tanzin* further confirms that the statute's "plain meaning at the time of enactment" allows for money damages as "appropriate relief," *Tanzin*, 141 S. Ct. at 491-93. *Tanzin* never once suggested the statute was susceptible to any alternative construction. Instead, a unanimous Supreme Court stressed that all of the relevant "textual cues" support damages, and that it would be quite "odd" to construe RFRA to foreclose the only meaningful form of relief, particularly when it was commonly available at the statute's enactment. *Id.* at 492. Because the text is clear, avoidance has no work to do.

The Supreme Court's sovereign immunity decision in *Sossamon II* "does not change this analysis"—because it says nothing about the meaning of "appropriate relief" with respect to *individual-capacity* suits. *Tanzin*, 141 S. Ct. at 492-93. In *Sossamon II*, the Supreme Court held that RLUIPA is not "so free from ambiguity" with respect to *official-capacity suits* such that it would effect a waiver of the states' sovereign immunity. 563 U.S. at 288. That holding fits perfectly with *Tanzin*'s plain-text methodology because the pre-*Smith* remedial landscape did *not* include damages for official-capacity suits. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 & n.10 (1989) (explaining that Section 1983 does not waive sovereign immunity). For cases involving *individual-capacity* suits, by comparison, the analysis from *Tanzin* confirms that the plain text is clear: "appropriate relief" against "persons acting under color of law" contemplates an action for damages against officials in their individual capacities. *Tanzin*, 141 S. Ct. at 490-93. Damages were available under Section 1983 before *Smith*, and RLUIPA accordingly restores that remedy after *Smith*.

Because *Sossamon*'s avoidance construction cannot survive *Tanzin*'s succinct, unanimous, and textualist analysis, this Court should formally recognize that it has been overruled.

## 2. RLUIPA's Authorization of Money Damages Does Not Violate the Spending Clause

Because the text is clear, this Court can leave for another day *Sossamon*'s constitutional concerns. *See Jennings*, 138 S. Ct. at 843-47 (resolving statutory question, despite constitutional-avoidance objections); *Johnson*, 142 S. Ct. at 1832-33 (same). But this Court also could conclude that RLUIPA's money-damages remedy is constitutional. Under Supreme Court precedent, Congress has the power under the Spending Clause in conjunction with the Necessary and Proper Clause to impose liability on officials who work for a state entity that has accepted federal funding subject to conditions, in order to ensure that Congress's conditions on the receipt of that funding are actually followed. *See Sabri*, 541 U.S. at 604-08.

**a.** The Constitution authorizes Congress to spend for the general welfare. U.S. Const., Art. I, § 8, cl. 1. That Spending Power allows Congress to "attach conditions on the receipt of federal funds" in order "to further broad policy objectives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But Congress's Spending Power is not restricted merely to conditions operating directly on fund recipients. Congress also has the power to "make all Laws which shall be necessary and proper for carrying into execution" the Spending Power. U.S. Const., Art. I, § 8, cl. 18. As the Supreme Court explained in *Sabri*, "Congress has authority under the Spending Clause to

appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare." *Sabri*, 541 U.S. at 605 (citations omitted).

In particular, *Sabri* upheld a criminal law that prohibited bribing any official of a state or local government that received more than $10,000 annually in federal funds. *Id.* at 602-03 (upholding 18 U.S.C. § 666(a)(2)).[5] That federal law mirrors RLUIPA's damages provision, in that it reaches beyond the state recipients of the federal spending, and "bring[s] federal power to bear directly on individuals" who do not receive any federal funds—*i.e.,* imposes individual criminal liability on non-recipients of federal funds. *Id.* at 608.

The Supreme Court upheld that exercise of Congressional authority under the Spending Clause and Necessary and Proper Clause, explaining

---

[5] That statute in *Sabri* "imposes federal criminal penalties on anyone who 'corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.'" 541 U.S. at 603 (quoting 18 U.S.C. § 666(a)(2)). Liability attaches if "the organization, government, or agency receiv[es], in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." *Id.* (quoting 18 U.S.C. § 666(b)).

that third-party culpability is a rational means of promoting a legitimate Congressional objective. Specifically, the Court reasoned that such liability "addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars." *Id.* at 605. The Court explained that Congress, acting under the Spending Clause, could utilize "necessary and proper legislation" to "fill[] [in] the regulatory gaps" left by prior federal anti-bribery law, which did not reach "bribes directed at state and local officials." *Id.* at 606-07. *Sabri* thus teaches that Congress has the power to impose individual liability on non-recipients, so long as that liability is a "rational means" to promote Congress's valid purposes under the Spending Clause, which includes "safeguard[ing] the integrity of the state, local, and tribal recipients of federal dollars." *Id.* at 605.

That holding follows inexorably from the Supreme Court's settled interpretation of the Necessary and Proper Clause. Under longstanding precedents, the Necessary and Proper Clause endows Congress with "broad power to enact laws that are 'convenient, or useful' or 'conducive' to the [principal] authority's 'beneficial exercise.'" *United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)). Put another way, Congress can enact a law so long as it

is "rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

RLUIPA's damages provision satisfies that test. "Congress has an interest in allocating federal funds to institutions that do not engage in discriminatory behavior or in conduct that infringes impermissibly upon individual liberties." *Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003). Because state entities like a prison "can act only through agents," *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949), it was reasonable for Congress to deter religious hostility in the prison systems that it subsidizes by requiring, as a condition for federal funding, that a prison's agents and officials be held personally liable for their misconduct.[6] After all, damages provide one of the most effective, if not the only, means to ensure that prison officials actually respect prisoners' religious freedom and exercise. *Supra* pp. 19-20, 23-25. In particular, in the context of civil suits and specifically prison civil rights suits, damages are often the "*only* form of relief*" that can provide any remedy and thus are a critical means

---

[6] *See Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168-69 (D.C. Cir. 2004) (upholding the Rehabilitation Act on the theory that Congress "did not want *any* federal funds to be used to facilitate disability discrimination" and "threat of federal damage actions was an effective deterrent").

for ensuring that Congress's conditions are actually followed by the officers and agents of the governmental grant recipient. *Tanzin*, 141 S. Ct. at 492.

Consider, once again, the facts alleged in this case: In the absence of a damages remedy, Defendants could toss aside this Court's *Ware* decision, shave Landor completely bald, and trap him in solitary confinement until his release date—all with impunity. Congress provided for money damages in RLUIPA to promote real and meaningful accountability for this kind of official misconduct and to prevent precisely the kind of circumvention at issue in this case. As the Supreme Court has said, "it is almost *axiomatic* that the threat of damages has a deterrent effect, . . . particularly so when the individual official faces personal financial liability." *Carlson v. Green*, 446 U.S. 14, 21 (1980).

In addition, Congress has a distinct interest, beyond deterrence, in subsidizing—albeit indirectly—only the salaries of those prison officials ready to honor religious diversity. And, on the flipside, Congress has an equal interest in *not* subsidizing the employment of those who run roughshod on the free exercise of religion. *See Madison v. Virginia*, 474 F.3d 118, 126 (4th Cir. 2006). And a state prison that does not wish to respect the religious exercise of its prisoners can simply decline federal funding for its operations and in turn entirely avoid exposure to RLUIPA. RLUIPA's

damages remedy is therefore constitutional under the Spending Clause and the Necessary and Proper Clause because it helps to safeguard Congress's effort to ensure that federally-funded state prisons—and the agents through which they operate—actually respect religious freedom. *See Sabri*, 541 U.S. at 605-08.

**b.** This Court in *Sossamon* did not grapple with or even cite *Sabri*. Instead, the Court relied upon generalized concerns regarding "representation interests protected by federalism" to conclude that Spending Clause legislation can only bind the recipient of grant funding. *Sossamon*, 560 F.3d at 328-29. That was error, as *Sabri* establishes that Congress can use the Necessary and Proper Clause, in conjunction with the Spending Clause, to impose individual liability upon non-recipients. Indeed, *Sossamon*'s federalism concerns would apply with greater force to the *criminal* statute that the Supreme Court upheld in *Sabri*. *See United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) ("States possess primary authority for defining and enforcing the criminal law." (citation omitted)). And in *Sabri*, the defendant was a private real estate developer. 541 U.S. at 602-03. Here, each defendant is an officer or agent of the grant recipient.

*Sabri* is also not alone, as the Supreme Court has elsewhere rejected a federalism challenge to Spending Clause legislation that imposed constraints on non-recipients. *See Lawrence County v. Lead-Deadwood Sch.*

*Dist. No. 40-1*, 469 U.S. 256, 260-70 (1985) (upholding, over a federalism challenge, a Spending Clause statute that granted money directly to municipalities and prohibited State non-recipients from dictating how the money be spent). Between *Lawrence County* and *Sabri*, the Supreme Court has made clear that Congress can impose conditions on federal funds that run against non-recipients—including civil liability—without raising intractable federalism problems.

*Sossamon* itself recognized that damages might be appropriate against non-recipients, at least when those non-recipients hold a close relationship with the recipient, such that they derive some (indirect) benefit from the federal funding. The *Sossamon* Court acknowledged that "[p]erhaps . . . by accepting employment in a federally funded state enterprise, a state official becomes a third-party beneficiary to the contract [embodied in RLUIPA], or knowingly and voluntarily subjects himself to [the] liability" RLUIPA attaches to those funds. 560 F.3d at 329 n.36. The Court, however, declined to address that argument because the plaintiff "d[id] not make [it]." *Id.*; *see also id.* at 322 nn.3, 5, 331 n.51, 336 (identifying additional deficiencies in the plaintiff's briefing)

Landor is making those arguments now and drawing support directly from the Supreme Court's controlling precedent. *Sabri* confirms that Con-

gress, through its Spending Clause power, may extend liability to non-re-
cipients who maintain even a minimal relationship with a funding recipi-
ent. *See Sabri*, 541 U.S. at 605-06. In this case, the relationship between
the individual official (the third-party beneficiary) and the prison (the
funding recipient) is significantly closer than it was in *Sabri*. The provision
at issue in *Sabri* imposed liability on any member of the general public
who communicates corruptly with an employee of a funding recipient. *See
id.* at 603 (discussing 18 U.S.C. § 666(a)(2)). RLUIPA, by contrast, imposes
liability directly on the employee of the funding recipient. RLUIPA thus
brings liability a full step closer to the funding recipient than did the stat-
ute in *Sabri*. If the *criminal* liability approved in *Sabri* does not "under-
mine[]" important "representation interests protected by federalism," then
the same must also be true for the *civil* liability against state and munici-
pal officers and employees under RLUIPA. *Sossamon*, 560 F.3d at 329.

* * *

RLUIPA in turn satisfies the Supreme Court's precedents for discern-
ing proper remedies under Spending Clause legislation. *See Cummings v.
Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022). Specifically,
the Court has "characterized . . . Spending Clause legislation as 'much in
the nature of a contract,'" *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (ci-
tation and emphasis omitted), and has thus "construe[d] the reach of

Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable,'" *Cummings*, 142 S. Ct. at 1570 (citation omitted and second alteration in original). As already explained (*supra* pp. 15-27), RLUIPA's text provides the requisite clear notice to states, prisons, and their officials that they may be held personally accountable for religious discrimination, should the states accept federal funding for their prison operations. That notice is particularly clear because RLUIPA does not purport to create some new and novel remedy against a sovereign defendant; instead, it *restores* a remedial landscape under which the states had operated for over a century and to which their employees were well adjusted to possible liability.

Congress thus made clear, in more ways than one through RLUIPA's plain text, that it was restoring the pre-*Smith* landscape, including damages against officers in their individual capacities. *Supra* pp. 15-27. And contrary to *Sossamon*, that relief does not exceed Congress's enumerated powers under the Spending Clause in conjunction with Necessary and Proper Clauses. For that reason, the Court should formally recognize that *Sossamon* has been overruled.

## II. Landor Plausibly Alleged That His RLUIPA Rights Were Violated

If this Court recognizes *Sossamon*'s overruling, it should vacate the district court's judgment and remand because Landor has plausibly pled a RLUIPA claim.

Under RLUIPA, Landor bore the "initial burden" to "show that (1) the relevant religious exercise is 'grounded in a sincerely held religious belief' and (2) the government's action or policy 'substantially burden[s] that exercise.'" *Ali v. Stephens*, 822 F.3d 776, 782-83 (5th Cir. 2016) (alteration in original) (quoting *Holt*, 574 U.S. at 361); *see also* 42 U.S.C. § 2000cc-1(a). Once Landor meets that initial burden, "the burden shift[s] to the [Defendants] to show that [their] refusal to allow [Landor] to [keep his dreadlocks] '(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest.'" *Holt*, 574 U.S. at 362 (quoting 42 U.S.C. § 2000cc-1(a)) (last two alterations in original). Prisons cannot rely upon a generalized security interest to satisfy that "demanding standard." *Ware*, 866 F.3d at 268. Instead, the Court must "scrutiniz[e] the asserted harm of granting specific exemptions to *particular religious claimants*" and weigh those harms that against "the marginal interest" to the state defendants "in enforcing the challenged government action in that particular context." *Holt*, 574

U.S. at 363 (quoting *Hobby Lobby*, 573 U.S. at 726-27) (alteration in original and emphasis added). That fact-specific inquiry is rarely appropriate for resolution on the pleadings. *See, e.g.*, *Fountain v. Thaler*, 629 F. App'x 592, 594-95 (5th Cir. 2015); *Odneal v. Pierce*, 324 F. App'x 297, 300-02 (5th Cir. 2009).

Applying these standards, Landor's allegations easily state a claim for relief—and then some. Landor is a devout Rastafarian who, for nearly two decades, grew his hair in dreadlocks as part of a religious vow. He alleges that the defendants imposed a "substantial burden" on his religious exercise when they handcuffed him to a chair, restrained him, and shaved his head bald—in flagrant violation of his religion and this Court's binding decision in *Ware*. *See supra* pp. 6-8.

In *Ware*, this Court held that the Louisiana Department of Corrections would violate RLUIPA if it were to forcibly remove the dreadlocks of a devout Rastafarian. 866 F.3d at 274. The Court reviewed Defendant LeBlanc's various "explanations" for the no-dreadlocks policy, and rejected each of them emphatically: "the [purported security] interests served by the grooming policies are not truly compelling," *id.* at 271, and the blanket ban on dreadlocks is not "the least restrictive means of serving any such interest," *id.* at 274. As *Ware* explains, the overwhelming majority of jurisdictions across the country permit inmates to wear dreadlocks as an

exercise of faith, *id.* at 273-74, and even the Louisiana Department of Public Safety and Corrections follows that consensus with respect to the many inmates housed in parish jails under its purview, *id.* at 271-72. This Court could not have been clearer that RLUIPA protects the religious exercise of individuals like Landor.

But rather than respect this Court's decision, the defendants and their agents threw it away and shaved Landor bald—because they were apparently dissatisfied with the quality of his paperwork. ROA.17-18. That is no excuse. Those allegations readily establish that defendants violated Landor's clearly established religious rights when they shackled and shaved him, and he is entitled to a remedy for that grievous violation. *See, e.g.*, *Milon v. LeBlanc*, 496 F. Supp. 3d 982, 989 (M.D. La. 2020) (a complaint stating "[t]he plaintiff is a Rastafarian and had his dreadlocks forcibly cut pursuant to the same policy at issue in *Ware* . . . states a claim under RLUIPA").

## CONCLUSION

For the foregoing reasons, this Court should vacate the judgment of the district court and remand for further proceedings.

Respectfully submitted,

<table>
<tr>
<td>

Casey Denson
Mercedes Townsend
CASEY DENSON LAW LLC
4601 Dryades Street
New Orleans, LA 70115
(504) 224-0110
cdenson@caseydensonlaw.com

</td>
<td>

/s/ Zachary D. Tripp
Zachary D. Tripp
  *Counsel of Record*
Joshua Halpern
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
zack.tripp@weil.com

Shai Berman
Sara Weiss
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

</td>
</tr>
</table>

November 14, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Zachary D. Tripp

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
zack.tripp@weil.com

November 14, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 9,222 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/* Zachary D. Tripp
Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
zack.tripp@weil.com

*Attorney for Appellant Damon Landor*

November 14, 2022