**Weil, Gotshal & Manges LLP**

2001 M Street, NW, Suite 600
Washington, DC 20036
+1 202 682 7000 tel
+1 202 857 0940 fax

BY ECF

**Zachary Tripp**
+1 (202) 682-7220
Zack.tripp@weil.com

July 7, 2023

Lyle W. Cayce
Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
Office of the Clerk
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

Re:    *Landor v. Louisiana Department of Corrections and Public Safety, et al.*, No. 22-30686

Dear Mr. Cayce,

Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiff-Appellant Damon Landor writes to notify this Court of the Supreme Court's decision in *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, No. 22-227 (June 15, 2023). *Lac du Flambeau* held that the Bankruptcy Code "unequivocally abrogates" tribal sovereign immunity even though the Code never "reference[s] Indian tribes specifically." Slip op. at 4, 10. Although this appeal concerns a different statute, *Lac du Flambeau*'s interpretive framework bears directly on the application of the Spending Clause "clear notice" principle to RLUIPA.

*Lac du Flambeau* holds that a clear-statement rule "is not a magic-words requirement" and that "Congress d[oes] not have to include a specific reference" to satisfy such a rule. *Id.* at 10. Nor need Congress "articulate[] its intent in the *most* straightforward way," "in any particular way," or even "in a single statutory section" in order to "speak[] unequivocally." *Id.* at 4, 10. Rather, "clear-statement rule[s]" are satisfied whenever "applying 'traditional' tools of statutory interpretation" yields only one "plausible interpretation" or "construction." *Id.* at 4, 11-12.

July 7, 2023
Page 2


Those principles confirm that RLUIPA's liability provision satisfies the Spending Clause's "clear notice" standard. As the Supreme Court explained in *Tanzin v. Tanvir*, all the traditional methods of statutory interpretation—and every indicia of meaning within the statute—point in the same direction and in favor of damages actions against individual employees. Blue Br. 19-28; Grey Br. 13-15. Defendants, in their brief and at oral argument, did not even attempt to engage with any of *Tanzin*'s plain-meaning observations, and they offer no account of how RLUIPA "can plausibly be read in [any other] way." *Lac du Flambeau*, slip op. at 11; *see also* Prof. Laycock Amicus Br. at 4-6, ECF No. 49-2.

RLUIPA thus "passes the clear-statement test" even if it does not "reference [money damages] specifically." *Lac du Flambeau*, slip op. at 10. Following *Lac du Flambeau*, this Court should hold the *Tanzin* abrogates this Court's decision in *Sossamon v. Texas* and reverse the district court's decision.


Respectfully submitted,

*/s/ Zachary Tripp*

Zachary Tripp
Joshua Halpern
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
zack.tripp@weil.com
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this letter complies with the volume limits set forth in Federal Rule of Appellate Procedure 28(j), because the body of the letter contains 335 words.

*/s/ Zachary Tripp*
Zachary Tripp

## CERTIFICATE OF SERVICE

I certify that on July 7, 2023, the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic filing issued through the Court's Electronic Case Filing system on this date.

*/s/ Zachary Tripp*
Zachary Tripp

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS ET AL. *v.* COUGHLIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 22–227.   Argued April 24, 2023—Decided June 15, 2023

Petitioner Lac du Flambeau Band of Lake Superior Chippewa Indians (the Band) is a federally recognized Indian tribe.  One of the Band's businesses, Lendgreen, extended respondent Brian Coughlin a payday loan.  Shortly after receiving the loan, Coughlin filed for Chapter 13 bankruptcy, triggering an automatic stay under the Bankruptcy Code against further collection efforts by his creditors.  But Lendgreen allegedly continued attempting to collect Coughlin's debt.  Coughlin filed a motion in Bankruptcy Court to enforce the automatic stay and recover damages.  The Bankruptcy Court dismissed the suit on tribal sovereign immunity grounds.  The First Circuit reversed, concluding that the Code "unequivocally strips tribes of their immunity."  33 F. 4th 600, 603.

*Held*: The Bankruptcy Code unambiguously abrogates the sovereign immunity of all governments, including federally recognized Indian tribes.  Pp. 3–16.

(a) Two provisions of the Bankruptcy Code lie at the heart of this case.  The first, 11 U. S. C. §106(a), expressly abrogates the sovereign immunity of "governmental unit[s]" for enumerated purposes.  The second, §101(27), defines "governmental unit" as "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  In order for these provisions to abrogate tribal sovereign immunity, Congress "must [have made] its intent . . . 'unmistakably clear in the language of the statute.'"  *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.,* 598 U. S. ___, ___.  If the statute can

plausibly be read to preserve sovereign immunity, Congress has not unambiguously expressed the requisite intent. *FAA* v. *Cooper*, 566 U. S. 284, 290. But Congress need not use any particular words to pass this clear-statement test. Pp. 3–4.

(b) The Bankruptcy Code unequivocally abrogates the sovereign immunity of any and every government with the power to assert such immunity. Because federally recognized tribes unquestionably fit that description, the Code's abrogation provision plainly applies to them as well. Pp. 4–16.

(1) Several features of the statute's text and structure point the way. To start, the definition of "governmental unit" exudes comprehensiveness. It begins with a long list of governments, varying in location, nature, and size. It then proceeds to capture subdivisions and components of every government in that list. And it concludes with a broad catchall phrase, sweeping in "other foreign or domestic government[s]." §101(27). Moreover, the catchall phrase's pairing of extremes—*i.e.*, "foreign or domestic"—appearing at the end of an extensive list unambiguously indicates Congress's intent to cover all governments in §101(27)'s definition. The abrogation provision in §106(a) in turn applies to *every* "governmental unit" in §101(27). It does not cherry-pick certain types of governments from that capacious list. Pp. 4–6.

(2) Other provisions of the Bankruptcy Code reinforce §106(a) and §101(27)'s plain text. To facilitate an "orderly and centralized" debt-resolution process, 1 Collier on Bankruptcy ¶1.01 (16th ed. 2023), the Code includes a number of requirements, like the automatic stay provision, that generally apply to *all* creditors. These basic requirements can be enforced against all kinds of creditors, whether the creditor is a governmental unit or not. At the same time, the Code contains limited exceptions to avoid impeding the functioning of governmental entities when they act as creditors. See, *e.g.*, §362(b)(4). Reading the statute to carve out certain governments from the definition of "governmental unit"—as petitioners would have the Court do—risks upending the policy choices that the Code embodies. And there is no indication that Congress meant to categorically exclude certain governments from these provisions' enforcement mechanisms and exceptions. Pp. 6–8.

(3) Federally recognized tribes are indisputably governments. They exercise uniquely governmental functions, and both Congress and this Court have repeatedly characterized them as governments. Accordingly, because the Bankruptcy Code unequivocally abrogates the sovereign immunity of all governments, and tribes undoubtedly count as governments, the Code unmistakably abrogates tribal sovereign immunity. Pp. 8–9.

Syllabus

    (c) Petitioners fail to sow doubt into these clear statutory provisions. Pp. 10–15.

    (1) Petitioners insist that neither §101(27) nor §106(a) mentions tribes by name. But Congress need not use any particular words to make its abrogation intent clear. *Cooper*, 566 U. S., at 291. And the fact that Congress has referenced tribes specifically in other statutes abrogating tribal sovereign immunity does not foreclose it from using different language to accomplish that same goal in other statutory contexts. Pp. 10–11.

    (2) Petitioners also contend that the catchall phrase "other foreign or domestic government" can plausibly be read to include only entities that are purely foreign "or" purely domestic. In petitioners' view, the catchall phrase would thus exclude tribes or other governments that have foreign *and* domestic features. But Congress has expressly instructed that the word "or," as used in the Code, "is not exclusive." §102(5). In any event, petitioners do not explain why the Bankruptcy Code would draw such a line in the sand.

    Finally, petitioners suggest that Congress has historically treated various types of governments differently for purposes of bankruptcy law, relying on provisions preceding the Bankruptcy Code's enactment. Yet petitioners fail to demonstrate that the Code—which comprehensively revised bankruptcy practice—carried forward any such differential treatment. Pp. 11–15.

33 F. 4th 600, affirmed.

    JACKSON, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. GORSUCH, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 22–227

LAC DU FLAMBEAU BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS, ET AL., PETITIONERS *v.*
BRIAN W. COUGHLIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 15, 2023]

JUSTICE JACKSON delivered the opinion of the Court.

The Bankruptcy Code expressly abrogates the sovereign immunity of "governmental unit[s]" for specified purposes. 11 U. S. C. §106(a). The question presented in this case is whether that express abrogation extends to federally recognized Indian tribes. Under our precedents, we will not find an abrogation of tribal sovereign immunity unless Congress has conveyed its intent to abrogate in unequivocal terms. That is a high bar. But for the reasons explained below, we find it has been satisfied here.

## I

Petitioner Lac du Flambeau Band of Lake Superior Chippewa Indians (the Band) is a federally recognized Tribe that wholly owns several business entities. In 2019, one of the Band's businesses, Lendgreen, allowed respondent Brian Coughlin to borrow $1,100 in the form of a high-interest, short-term loan. But Coughlin filed for Chapter 13 bankruptcy before he fully repaid the loan.

Under the Bankruptcy Code, Coughlin's filing of the bankruptcy petition triggered an automatic stay against

further collection efforts by creditors, including Lendgreen. See §362(a). Yet, according to Coughlin, Lendgreen continued its efforts to collect on his debt, even after it was reminded of the pending bankruptcy petition. Coughlin alleges that Lendgreen was so aggressive in its efforts to contact him and collect the money that he suffered substantial emotional distress, and at one point, even attempted to take his own life.

Coughlin eventually filed a motion in Bankruptcy Court, seeking to have the stay enforced against Lendgreen, its parent corporations, and the Band (collectively, petitioners). Coughlin also sought damages for emotional distress, along with costs and attorney's fees. See §362(k) (providing a damages award to individuals injured by willful violations of the automatic stay).

Petitioners moved to dismiss. They argued that the Bankruptcy Court lacked subject-matter jurisdiction over Coughlin's enforcement proceeding, as the Band and its subsidiaries enjoyed tribal sovereign immunity from suit.[1] The Bankruptcy Court agreed; it held that the suit had to be dismissed because the Bankruptcy Code did not clearly express Congress's intent to abrogate tribal sovereign immunity.

In a divided opinion, the Court of Appeals for the First Circuit reversed, concluding that the Bankruptcy Code "unequivocally strips tribes of their immunity." *In re Coughlin*, 33 F. 4th 600, 603–604 (2022). In so holding, the First Circuit deepened a split among the Courts of Appeals on this question. Compare *Krystal Energy Co.* v. *Navajo Nation*, 357 F. 3d 1055, 1061 (CA9 2004) (holding that the Bankruptcy Code abrogates tribal sovereign immunity), with *In re Greektown Holdings, LLC*, 917 F. 3d 451, 460–461 (CA6

_____

[1] It is undisputed in this case, and we assume herein, that the Band's subsidiaries are arms of the Tribe and enjoy the Band's sovereign immunity. *In re Coughlin*, 33 F. 4th 600, 604, n. 1 (CA1 2022); *In re Coughlin*, 622 B. R. 491, 493 (Bkrtcy. Ct. Mass. 2020).

2019) (concluding the reverse). We granted certiorari to address the lower courts' inconsistent holdings. 598 U. S. ___ (2023).

## II

## A

Two provisions of the Bankruptcy Code lie at the crux of this case. The first—11 U. S. C. §106(a)—abrogates the sovereign immunity of "governmental unit[s]." It provides: "Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section." Section 106(a) goes on to enumerate a list of Code provisions to which the abrogation applies, including the provision governing automatic stays.

The second relevant provision is §101(27). That provision defines "governmental unit" for purposes of the Code. It states that that term

> "means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."

The central question before us is whether the abrogation provision in §106(a) and the definition of "governmental unit" in §101(27), taken together, unambiguously abrogate the sovereign immunity of federally recognized tribes.

## B

To "abrogate sovereign immunity," Congress "must make its intent . . . 'unmistakably clear in the language of the statute.'" *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. ___, ___ (2023) (slip op., at 6). This well-settled rule applies

to federally recognized tribes no less than other defendants with sovereign immunity. *Ibid.* We have held that tribes possess the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58 (1978). Our cases have thus repeatedly emphasized that tribal sovereign immunity, absent a clear statement of congressional intent to the contrary, is the "baseline position." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 790 (2014).

This clear-statement rule is a demanding standard. If "there is a plausible interpretation of the statute" that preserves sovereign immunity, Congress has not unambiguously expressed the requisite intent. *FAA* v. *Cooper*, 566 U. S. 284, 290 (2012); accord, *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 37 (1992).

The rule is not a magic-words requirement, however. To abrogate sovereign immunity unambiguously, "Congress need not state its intent in any particular way." *Cooper*, 566 U. S., at 291. Nor need Congress "make its clear statement in a single [statutory] section." *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 76 (2000). The clear-statement question is simply whether, upon applying "traditional" tools of statutory interpretation, Congress's abrogation of tribal sovereign immunity is "clearly discernable" from the statute itself. *Cooper*, 566 U. S., at 291.

### III

We conclude that the Bankruptcy Code unequivocally abrogates the sovereign immunity of any and every government that possesses the power to assert such immunity. Federally recognized tribes undeniably fit that description; therefore, the Code's abrogation provision plainly applies to them as well.

Opinion of the Court

A

Several features of the provisions' text and structure compel this conclusion.

As an initial matter, the definition of "governmental unit" exudes comprehensiveness from beginning to end. Congress has rattled off a long list of governments that vary in geographic location, size, and nature. §101(27) (including municipalities, districts, Territories, Commonwealths, States, the United States, and foreign states). The provision then proceeds to capture subdivisions and components of every government within that list. *Ibid.* (accounting for any "department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state"). And it concludes with a broad catchall phrase, sweeping in "other foreign or domestic government[s]." *Ibid.*

When faced with analogously structured provisions in other contexts, we have noted their all-encompassing scope. See, *e.g.*, *Taylor* v. *United States*, 579 U. S. 301, 305–306 (2016) (characterizing as "unmistakably broad" a criminal statute defining "commerce" to include a list of specific instances in which the Federal Government would have jurisdiction, followed by a broad residual phrase); see also *Marietta Memorial Hospital Employee Health Benefit Plan* v. *DaVita Inc.*, 596 U. S. ___, ___, n. 1 (2022) (slip op., at 4, n. 1) (similar). We find the strikingly broad scope of §101(27)'s definition of "governmental unit" to be significant in this context as well.

The catchall phrase Congress used in §101(27) is also notable in and of itself. Few phrases in the English language express all-inclusiveness more than the pairing of two extremes. "Rain or shine" is a classic example: If an event is scheduled to occur rain or shine, it will take place whatever the weather that day might be. Same with the phrase "near and far": If people are traveling from near and far, they are coming from all over the map, regardless of the particular

distance from point A to point B.

The pairing of "foreign" with "domestic" is of a piece with those other common expressions. For instance, if someone asks you to identify car manufacturers, "foreign or domestic," your task is to name any and all manufacturers that come to mind, without particular regard to where exactly the cars are made or the location of the companies' headquarters. Similarly, at the start of each Congress, a cadre of newly elected officials "'solemnly swear'" to "'support and defend the Constitution of the United States against all enemies, foreign and domestic.'" 5 U. S. C. §3331. That oath—which each Member of Congress who enacted the Bankruptcy Code took—indisputably pertains to enemies anywhere in the world. Accordingly, we find that, by coupling foreign and domestic together, and placing the pair at the end of an extensive list, Congress unmistakably intended to cover all governments in §101(27)'s definition, whatever their location, nature, or type.

It is also significant that the abrogation of sovereign immunity in §106(a) plainly applies to all "governmental unit[s]" as defined by §101(27). Congress did not cherry-pick *certain* governments from §101(27)'s capacious list and only abrogate immunity with respect to those it had so selected. Nor did Congress suggest that, for purposes of §106(a)'s abrogation of sovereign immunity, some *types* of governments should be treated differently than others. Instead, Congress categorically abrogated the sovereign immunity of *any* governmental unit that might attempt to assert it.

## B

Other aspects of the Bankruptcy Code reinforce what §106(a)'s and §101(27)'s plain text conveys.

Through various provisions, the Bankruptcy Code offers debtors a fresh start by discharging and restructuring their debts in an "orderly and centralized" fashion. See, *e.g.*, 1

Opinion of the Court

Collier on Bankruptcy ¶1.01 (16th ed. 2023); *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U. S. ___, ___ (2018) (slip op., at 4). The automatic-stay requirement, for example, keeps creditors from "dismember[ing]" the estate while the bankruptcy case proceeds. *Chicago* v. *Fulton*, 592 U. S. ___, ___ (2021) (slip op., at 2); 11 U. S. C. §362. The Code's discharge provision enjoins creditors from trying to collect debts that have been discharged in a bankruptcy case. §524(a). And its plan-confirmation provisions, as relevant here, "bind . . . each creditor" to whatever repayment plan the bankruptcy court approves, "whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." §1327(a); see also, *e.g.*, §§1141(a), 1227(a).

These protections sweep broadly, by their own terms. To facilitate the Code's "orderly and centralized" debt-resolution process, Collier on Bankruptcy ¶1.01, these provisions' basic requirements generally apply to *all* creditors.[2] Courts can also enforce these requirements against any kind of noncompliant creditor—whether or not the creditor is a "governmental unit"—by virtue of §106(a)'s abrogation of sovereign immunity. §§106(a)(1)–(3).

At the same time, so as to avoid impeding the functioning of governmental entities when they act as creditors, the Code contains a number of limited exceptions. For instance, the automatic-stay requirement does not preclude "governmental unit[s]" from enforcing their "police and regulatory power[s]" in certain proceedings, §362(b)(4), or from

_____

[2] 11 U. S. C. §362(a) (the filing of a bankruptcy petition "operates as a stay, applicable to *all* entities" (emphasis added)); §362(b) (providing limited exceptions to the automatic-stay provision, none of which categorically exclude a certain type of creditor for all purposes); §524(a)(2) (the discharge of a debt "operates as an injunction against the commencement or continuation of an action . . . to collect, recover or offset *any* [discharged] debt as a personal liability of the debtor" (emphasis added)); §1327(a) ("The provisions of a confirmed plan bind the debtor and *each* creditor" (emphasis added)).

pursuing specific tax-related activities, §§362(b)(9), (18), (26). The Code additionally exempts from discharge certain debts for a "fine, penalty, or forfeiture" owed to a "governmental unit." §523(a)(7).

Reading the statute to carve out a subset of governments from the definition of "governmental unit," as petitioners' view of the statute would require, risks upending the policy choices that the Code embodies in this regard. That is, despite the fact that the Code generally subjects all creditors (including governmental units) to certain overarching requirements, under petitioners' reading, some government creditors would be immune from key enforcement proceedings while others would face penalties for their noncompliance. And while the Code is finely tuned to accommodate essential governmental functions (like tax administration and regulation) as a general matter, petitioners would have us find that certain governments are excluded from those provisions' reach, notwithstanding the fact that they engage in tax and regulatory activities too. There is no indication that Congress meant to categorically exclude certain governments from these provisions' enforcement mechanisms and exceptions, let alone in such an anomalous manner. Cf. *Law* v. *Siegel*, 571 U. S. 415, 424 (2014) (declining to read into the Code an exception Congress did not include in its "meticulous" and "carefully calibrated" scheme).

## C

Our conclusion that all government creditors are subject to abrogation under §106(a) brings one remaining question to the fore—whether federally recognized tribes qualify as governments. Petitioners do not seriously dispute that federally recognized tribes are governments, and for good reason. Federally recognized tribes exercise uniquely governmental functions: "They have power to make their own substantive law in internal matters, and to enforce that law in their own forums." *Santa Clara Pueblo*, 436 U. S., at 55–

Opinion of the Court

56 (citations omitted). They can also "tax activities on the reservation." *Plains Commerce Bank* v. *Long Family Land & Cattle Co.*, 554 U. S. 316, 327 (2008).

It is thus no surprise that Congress has repeatedly characterized tribes as governments.[3] And this Court has long recognized tribes' governmental status as well. See, *e.g.*, *Bay Mills*, 572 U. S., at 788–789; *Santa Clara Pueblo*, 436 U. S., at 57–58. We have done so generally and also in the specific context of tribal sovereign immunity. Tribal sovereign immunity, "we have explained, is 'a necessary corollary to Indian sovereignty and self-governance.'" *Bay Mills*, 572 U. S., at 788; see also *id.*, at 789 (discussing immunity as an example of tribes' "governmental powers and attributes").

Putting the pieces together, our analysis of the question whether the Code abrogates the sovereign immunity of federally recognized tribes is remarkably straightforward. The Code unequivocally abrogates the sovereign immunity of all governments, categorically. Tribes are indisputably governments. Therefore, §106(a) unmistakably abrogates their sovereign immunity too.[4]

───────────

[3]See, *e.g.*, Indian Self-Determination and Education Assistance Act, §104(a)(1), 88 Stat. 2207 (referring to "the strengthening or improvement of tribal government"); Tribal Self-Governance Act of 1994, §§202(2), (5)(A), 108 Stat. 4271 ("recogniz[ing] a special government-to-government relationship with Indian tribes," and "transferring control to tribal governments . . . over funding and decisionmaking for Federal programs"); Compact of Self-Governance Between the Duckwater Shoshone Tribe and the United States of America, Art. I, §2(c) (1995) (explaining that the Compact would allow the Tribe to "take its rightful place in the family of governments in the federal constitutional system," and "reorganize tribal government programs and services").

[4]Given this holding, we need not decide whether tribes qualify as purely "domestic" governments. Compare Brief for Petitioners 33 (insisting tribes are not clearly domestic governments), and *post*, at 5–11 (GORSUCH, J., dissenting) (similar), with Brief for Respondent 40–41 (contending that they are). See also *infra*, at 12–14.

## IV

Petitioners raise two main arguments in an attempt to sow doubt into these clear statutory provisions.  Neither creates the ambiguity petitioners seek.

### A

For their opening salvo, petitioners try to make hay out of the simple fact that neither §101(27) nor §106(a) mentions Indian tribes by name.  Had Congress wanted to abrogate tribal sovereign immunity, petitioners claim, the most natural and obvious way to have expressed that intent would have been to reference Indian tribes specifically, rather than smuggle them into a broadly worded catchall phrase.

But, as explained at the outset, *supra*, at 4, the clear-statement rule is not a magic-words requirement.  Thus, Congress did not have to include a specific reference to federally recognized tribes in order to make clear that it intended for tribes to be covered by the abrogation provision.  As long as Congress speaks unequivocally, it passes the clear-statement test—regardless of whether it articulated its intent in the *most* straightforward way.  *Cooper*, 566 U. S., at 291.

Trying a different tack, petitioners point to historical practice.  In statute after statute, they say, Congress has specifically mentioned Indian tribes when abrogating their sovereign immunity.  And in no case has this Court ever found an abrogation of tribal sovereign immunity where the statute did not reference Indian tribes explicitly.  See Brief for Petitioners 24–26.

These statistics sound quite noteworthy at first glance.  But they do not move the needle in this case.  For one thing, none of petitioners' cited examples involved a statutory provision that was worded analogously to, and structured like,

Opinion of the Court

the ones at issue here.[5]  Moreover, the universe of cases in which we have addressed federal statutes abrogating tribal sovereign immunity is exceedingly slim.[6]

In any event, the fact that Congress has referenced tribes specifically in some statutes abrogating tribal sovereign immunity does not foreclose it from using different language to accomplish that same goal in other statutory contexts. Even petitioners appear to concede this basic point.  They agree that Congress could have used a phrase like "every government" or "any government with sovereign immunity" to express unambiguously the requisite intent to abrogate the sovereign immunity of tribes.  *Id.*, at 27 (internal quotation marks omitted).  For the reasons discussed above, we believe Congress did just that.

## B

Petitioners further contend that even if the relevant provisions could theoretically cover tribes, the statute can plausibly be read in a way that preserves their immunity.

––––––––––

[5] Petitioners rely, for instance, on the Resource Conservation and Recovery Act of 1976, which authorizes a "person" to "commence a civil action."  42 U. S. C. §6972(a).  "Person" is defined under that statute to include a "municipality," which is in turn defined to encompass "a city, town, borough, county, parish, district, or other public body created by or pursuant to State law . . . or an Indian tribe or authorized tribal organization."  §§6903(13), (15); see also Brief for Petitioners 25 (citing similar provisions).  The fact that Congress mentioned Indian tribes specifically when including them in the category of a "person" or "municipality" says little about Congress's purported need to name Indian tribes when referring to them as a "governmental unit" or "other foreign or domestic government."

[6] The parties' briefing identifies only two cases.  See *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 791 (2014) (recognizing partial abrogation); *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 513 (1940).

1

According to petitioners, the catchall phrase "other foreign or domestic government" might simply capture entities created through "interstate compacts," which cannot neatly be characterized as a State or an instrumentality of a State under §101(27)'s enumerated list. *Id.*, at 40–41 (internal quotation marks omitted). Interpreted in that fashion, petitioners maintain, the catchall phrase would exclude governmental entities that are not purely foreign or purely domestic—like tribes or the International Monetary Fund (IMF). Tr. of Oral Arg. 8–9.

If this interpretation of the statute sounds far-fetched, that is because it is. To find petitioners' construction plausible, we would have to interpret "other foreign or domestic government" to impose a rigid division between foreign governments on the one hand and domestic governments on the other, leaving out any governmental entity that may have both foreign and domestic characteristics (like tribes or the IMF). But Congress has expressly instructed that the word "or," as used in the Code, "is not exclusive." 11 U. S. C. §102(5). As a result, we have serious doubts that Congress meant for §101(27) to elicit the laser focus on "or" that petitioners' reading of "foreign or domestic" would entail.[7]

_____

[7] Our dissenting colleague puts forth two hypotheticals that supposedly cast doubt on this conclusion. See *post*, at 13–14 (opinion of GORSUCH, J.). The first involves choosing a pet that is "'small or a dog,'" while the second concerns an offer to have "chocolate or vanilla" ice cream. *Ibid.* But these hypotheticals are not remotely analogous to "foreign or domestic." For one thing, the terms "foreign" and "domestic" are two poles on a spectrum. See *supra*, at 5–6. Neither "small" and "dog" nor "chocolate" and "vanilla" fit that bill. For another, whereas the pairing of "foreign" and "domestic" often covers the waterfront, see *supra*, at 6, the dissent's hypothetical pairings do not have that same effect. And unlike animals (which need not be small or doglike) or ice creams (which need not be chocolate or vanilla), every government *must* be foreign or domestic to some degree; the question is just where on the spectrum it

The dissent's own arguments undermine any suggestion that Congress adopted such a siloed view. For instance, the dissent repeatedly paints tribes as occupying a hybrid position between foreign and domestic, *post*, at 6, 8–9 (opinion of GORSUCH, J.), and posits that Territories historically share this hybrid status as well, *post*, at 10 (describing Territories as tribes' "close comparator"). Yet, as the dissent readily acknowledges, Congress expressly included Territories within §101(27)'s definition of "governmental unit." If, on the dissent's own account, Territories are "neither foreign nor domestic," *ibid.*—and fall within §101(27)'s purview nevertheless—it is hard to see how §101(27)'s catchall phrase would simultaneously exclude other entities that share that same feature. §101(27) ("'governmental unit' means United States; State; . . . Territory; . . . foreign state; or *other* foreign or domestic government" (emphasis added)).

In any case, neither petitioners nor the dissent explain why the Code would draw such a line in the sand. None of the carefully calibrated exceptions noted in Part III–B, *supra*, for governmental units performing regulatory and tax-related functions turn on whether a government is purely foreign or domestic. Likewise, it is hard to see why the Code would subject purely foreign or domestic governments to enforcement proceedings while at the same time immunizing government creditors that have both foreign and domestic attributes. Considering that the one thing *every* entity in §101(27)'s enumerated list has in common is its governmental nature—and that is the same characteristic that matters when the Code addresses "governmental unit[s]"

_____

falls. See *post*, at 6 (observing that the Constitution "appear[s] to 'place Indian [T]ribes in an intermediate category between foreign and domestic states' "); *post*, at 8 (tribes occupy a " 'hybrid position' between 'foreign and domestic states' ").

14      LAC ᴅᴜ FLAMBEAU BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS *v.* COUGHLIN

from one provision to the next[8]—we are highly skeptical that Congress distinguished *between* governments in the way petitioners suggest.

2

Undaunted, petitioners note that Congress has historically treated various types of governments differently for purposes of bankruptcy law. Tr. of Oral Arg. 14–15; Reply Brief 21. They assert that, in the decades leading up to the Bankruptcy Code's enactment, bankruptcy law afforded certain benefits to "'the United States or any State or any subdivision thereof,'" leaving out entities that did not fall into one of those enumerated categories. Reply Brief 21 (quoting §64(a)(4), 52 Stat. 874).

Even if petitioners' understanding of this history is correct, they have failed to demonstrate that the Code carried forward any such differential treatment. Congress ushered in "a new, unprecedented era in bankruptcy practice" when it enacted the Code in 1978. 1 W. Norton, Bankruptcy Law and Practice §1:9, p. 1-17 (3d ed. 2023); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 52–53 (1982) (plurality opinion) (describing the Code as "a comprehensive revision of the bankruptcy laws"). Both §101(27)'s definition of "governmental unit" and §106(a)'s abrogation of sovereign immunity were some of the many changes Congress made. The prior statute did not provide a general definition for governmental entities, much less in-

---

[8] For example, the Code defines "domestic support obligation" to include debts "owed to or recoverable by" spouses as well as "governmental unit[s]." §101(14A). And the term "person" covers an "individual, partnership, and corporation," as well as a "governmental unit that . . . acquires an asset from a person . . . as a result of the operation of a loan guarantee agreement" or "as receiver or liquidating agent of a person." §101(41). The main feature that sets "governmental unit[s]" apart from other entities mentioned in these definitions is their governmental nature.

Opinion of the Court

clude any provision expressly abrogating governments' sovereign immunity. Instead, it set forth a general definition for "States," which encompassed Territories, possessions, and the District of Columbia. 52 Stat. 842. Then, in each provision where governmental entities were relevant, Congress specified the particular governmental entities to which that provision pertained. See, *e.g.*, §17(1), *id.*, at 851 (exempting from discharge debts "due as a tax levied by the United States, or any State, county, district, or municipality"); *id.*, at 874 (providing priority status to "the United States or any State or any subdivision thereof").

Section 101(27)'s definition of "governmental unit" has an undeniably broader reach than the statutory provisions that preceded it. Section 101(27)'s definition includes, for instance, foreign countries and instrumentalities, when such entities had generally been previously absent. And the expansive definition of "governmental unit" in §101(27) applies throughout the Bankruptcy Code. In addition, for those who find legislative history useful, the Senate and House Reports that accompanied the Code indicate that "governmental unit" was intended to be defined "in the broadest sense." S. Rep. No. 95–989, p. 24 (1978); H. R. Rep. No. 95–595, p. 311 (1977). When Congress later added §106(a)'s abrogation provision, it was *that* comprehensive definition of governmental unit that Congress used to specify the scope of the abrogation's sweep.

Thus, however Congress may have treated governmental entities in bankruptcy law prior to 1978, it had clearly altered its view about the scope of coverage relative to governments by the time it enacted §101(27) and §106(a). Those provisions unequivocally extend to *all* governments, for the reasons already discussed, and we decline to read ambiguity into the statute where none exists.

\*    \*    \*

We find that the First Circuit correctly concluded that the

16      LAC DU FLAMBEAU BAND OF LAKE SUPERIOR
        CHIPPEWA INDIANS *v.* COUGHLIN

Bankruptcy Code unambiguously abrogates tribal sovereign immunity.  Therefore, the decision below is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 22–227

––––––––––

## LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, ET AL., PETITIONERS *v.* BRIAN W. COUGHLIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 15, 2023]

JUSTICE THOMAS, concurring in the judgment.

As I have explained, to the extent that tribes possess sovereign immunity at all, that immunity does not extend to "suits arising out of a tribe's commercial activities conducted beyond its territory." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 815 (2014) (dissenting opinion). Because respondent's stay-enforcement motion arose from petitioners' off-reservation commercial conduct, petitioners lack sovereign immunity regardless of the Bankruptcy Code's abrogation provision. I therefore concur in the Court's judgment.

"Tribal immunity is a judicial doctrine that is not mandated by the Constitution, . . . developed almost by accident, was reiterated with little analysis, and does not reflect the realities of modern-day Indian tribes." *Upper Skagit Tribe* v. *Lundgren*, 584 U. S. ___, ___ (2018) (THOMAS, J., dissenting) (slip op., at 12) (internal quotation marks omitted). To the extent that tribes have any sovereign immunity at all, it is a common-law immunity. *Bay Mills*, 572 U. S., at 816–817. Unlike the sovereign immunity enjoyed by the States under the Constitution, common-law immunity "is not a freestanding right that applies of its own force when a sovereign faces suit in the courts of another." *Id.*, at 816 (in-

ternal quotation marks omitted). Rather, it "normally depends on the second sovereign's law" as a matter of comity. *Ibid.* (internal quotation marks omitted). Because no federal law accords tribes sovereign immunity in federal court, petitioners lack immunity in this federal case.

Moreover, even if federal courts could afford immunity to tribes as a matter of comity, comity considerations would not help petitioners. "Even with respect to fully sovereign foreign nations, comity has long been discarded as a sufficient reason to grant immunity for *commercial* acts"—like those at issue here. *Id.*, at 817 (emphasis added). And, far from furthering comity principles, recognizing immunity for off-reservation commercial acts "represents a substantial affront to a different set of sovereigns—the States." *Ibid.* When a tribe engages in off-reservation commercial activity, "it necessarily acts within the territory of a sovereign State." *Id.*, at 818. Thus, to grant tribes a unique and unjustified immunity from both federal and state jurisdiction for commercial acts committed on a State's territory "aggravate[s] relationships between States and tribes throughout the country." *Id.*, at 818–819. Accordingly, any common-law immunity that petitioners possess cannot support their claim to immunity in federal court for their off-reservation commercial conduct.

The Court's tribal immunity doctrine is also out of step with more recent decisions. In *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___ (2019), the Court recognized that the 50 States possess a unique form of immunity that applies of its own force in the courts of sister States, *id.*, at ___–___ (slip op., at 7–16), as well as those of the Federal Government, *id.*, at ___ (slip op., at 12) (collecting cases). This immunity stems from the Constitution itself and belongs only to the 50 States through their ratification of the Constitution or admission to the Union on an equal footing with the original States. See *Alden* v. *Maine*, 527 U. S. 706, 713

THOMAS, J., concurring in judgment

(1999). As a result, it is distinct from common-law immunity, which depends upon the forum court's sovereign for recognition. *Bay Mills*, 572 U. S., at 816. By treating tribal immunity like state immunity, the Court's tribal immunity case law has afforded tribes, by judicial fiat, a form of immunity that the Constitution accords to the 50 States, and only the 50 States.

Finally, this Court's tribal immunity doctrine continues to artificially exempt tribes from generally applicable laws. I warned nearly a decade ago that tribal immunity "will continue to invite problems, including *de facto* deregulation of highly regulated activities; unfairness to tort victims; and increasingly fractious relations with States and individuals alike." *Id.*, at 825. This is a case in point. In order to avoid state payday loan regulation, "payday lenders . . . often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." *Ibid.* Petitioners here rely on tribal immunity to avoid not only state but also federal payday loan regulation. They further seek to leverage this immunity to pursue respondent on his debt while other creditors' collection efforts are stayed. Tribal immunity thus creates a pathway to circumvent vast swaths of both state and federal laws.

The consequences of the Court's erroneous tribal immunity precedents have only gotten worse over the years. See *id.*, at 814 (Scalia, J., dissenting) ("I am now convinced that [*Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751 (1998)] was wrongly decided; that, in the intervening 16 years, its error has grown more glaringly obvious; and that *stare decisis* does not recommend its retention"); *id.*, at 831 (Ginsburg, J., dissenting) ("[T]his Court's declaration of an immunity thus absolute was and remains exorbitant"). Further, the doctrine simply cannot be reconciled with the Court's precedents affirming "that the States have legislative jurisdiction over the off-reservation con-

duct of Indian tribes, and even over some on-reservation ac-
tivities." *Kiowa*, 523 U. S., at 762 (Stevens, J., dissenting)
(describing the Court's prior cases).  Rather than accepting
the flawed premise of tribal immunity and deciding the ab-
rogation question beyond the looking glass, the Court
should simply abandon its judicially created tribal sover-
eign immunity doctrine.

GORSUCH, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–227

_____

## LAC DU FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, ET AL., PETITIONERS *v.* BRIAN W. COUGHLIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[June 15, 2023]

JUSTICE GORSUCH, dissenting.

Until today, there was "not one example in all of history where [this] Court ha[d] found that Congress intended to abrogate tribal sovereign immunity *without* expressly mentioning Indian tribes somewhere in the statute." *In re Greektown Holdings, LLC*, 917 F. 3d 451, 460 (CA6 2019) (internal quotation marks omitted). No longer. The Court reads the phrase "other foreign or domestic government," 11 U. S. C. §101(27), as synonymous with "any and every government," *ante,* at 4—all for the purpose of holding that §106(a) of the Bankruptcy Code abrogates tribal sovereign immunity. It is a plausible interpretation. But plausible is not the standard our tribal immunity jurisprudence demands. Before holding that Congress has vitiated tribal immunity, the Legislature must "unequivocally express" its intent to achieve that result. *C & L Enterprises, Inc.* v. *Citizen Band Potawatomi Tribe of Okla.*, 532 U. S. 411, 418 (2001) (internal quotation marks omitted).

Respectfully, I do not think the language here does the trick. The phrase "other foreign or domestic government" could mean what the Court suggests: every government, everywhere. But it could also mean what it says: every "other foreign . . . government"; every "other . . . domestic government." And properly understood, Tribes are neither

of those things.  Instead, the Constitution's text—and two centuries of history and precedent—establish that Tribes enjoy a unique status in our law.  Because this reading of the statute is itself (at worst) a plausible one, I would hold that the Bankruptcy Code flunks this Court's clear-statement rule and reverse.

I

As the Court reaffirms today, "the doctrine of tribal immunity is settled law."  *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751, 756 (1998); see *ante,* at 3–4.  Nor should that fact come as a surprise.  From the founding to the present, this Court has recognized the Tribes' continued existence as "independent sovereigns."  *Haaland* v. *Brackeen*, 599 U. S. ___, ___–___ (2023) (GORSUCH, J., concurring) (slip op., at 12–18); see, *e.g., United States* v. *Wheeler*, 435 U. S. 313, 322 (1978); *Worcester* v. *Georgia*, 6 Pet. 515, 559 (1832) (Marshall, C. J., for the Court).

A "necessary corollary to [that] Indian sovereignty" is immunity from private suit.  *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 476 U. S. 877, 890 (1986).  It is, after all, "inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.*"  The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton).  That understanding, derived from both "common law sovereign immunity" and "law-of-nations sovereign immunity," is a background principle on which the Constitution itself rests.  See *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___–___ (2019) (slip op., at 6–9) (internal quotation marks omitted) (citing authorities).  And it applies to Tribes no less than foreign nations, *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58 (1978), a tradition that traces back over 170 years, see *Parks* v. *Ross*, 11 How. 362, 374 (1851).  See also W. Wood, It Wasn't an Accident:  The Tribal Sovereign Immunity Story, 62 Am.

GORSUCH, J., dissenting

U. L. Rev. 1587, 1640 (2013) (Wood).

While venerable, tribal immunity—like its state and foreign counterparts—is not immutable. The federal government can abrogate it, at least as far as its fonts of power let it. See *Santa Clara Pueblo*, 436 U. S., at 58–59; cf. *Brackeen*, 599 U. S., at ___ (opinion of GORSUCH, J.) (slip op., at 31). But the choice to abrogate tribal immunity is fundamentally political in nature. It is a choice that therefore belongs to Congress, the "department which can modify [the law] at will," and not the Judiciary, the "department which can pursue only the law as it is written." *Brown* v. *United States*, 8 Cranch 110, 129 (1814) (Marshall, C. J., for the Court). Recognizing the Constitution's division of responsibility, this Court has long left all decisions about tribal and other sorts of sovereign immunity "in Congress's hands." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 789 (2014).

Because "erroneous abrogation[s]" of immunity risk inter-sovereign conflicts and reprisals, this Court employs an additional interpretive guardrail—"a clear statement requirement designed to ensure that the political branches acted knowingly and intentionally" in divesting sovereigns of their legal entitlements. A. Bellia & B. Clark, The Law of Nations as Constitutional Law, 98 Va. L. Rev. 729, 792–793 (2012). Under this approach, we will not read a statute to abrogate immunity "if any other possible construction remains." *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804); see also, *e.g., Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. ___, ___ (2023) (slip op., at 1). That goes for Tribes just as it goes for other sovereigns; it is an "enduring principle of Indian law" that we "will not lightly assume that Congress in fact intends to undermine Indian" sovereignty absent pellucid evidence to the contrary. *Bay Mills*, 572 U. S., at 790.

All this explains the now-familiar clear-statement rule

that this Court has endorsed on countless occasions. If Congress wishes to abrogate tribal immunity, its "decision must be clear." *Ibid.* And the Legislature must "unequivocally express" its decision in the text of a statute. *C & L Enterprises*, 532 U. S., at 418 (internal quotation marks omitted). Under that rule, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *FAA* v. *Cooper*, 566 U. S. 284, 290 (2012). Keep that hard-to-meet standard in mind. We will return to it as we make our way through the statutory text driving today's dispute.

## II

The Bankruptcy Code stipulates that, "notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section." §106(a). That language, this Court has previously held, signals a clear intent to abrogate sovereign immunity. See *Central Va. Community College* v. *Katz*, 546 U. S. 356, 379 (2006). But as to which sovereigns? The answer to that question lies elsewhere in the Bankruptcy Code. "The term 'governmental unit,'" it says, "means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." §101(27).

That is a lot of words. For present purposes, however, only the last five matter: "other foreign or domestic government." No one argues any of the other clauses could potentially refer to Tribes. We can further winnow down the options from there. No one thinks Tribes qualify as "foreign . . . government[s]." That leaves only two possibilities. Tribes could qualify as "'domestic governments'"— respondent's lead argument. Tr. of Oral Arg. 41. Or the

phrase "other foreign or domestic government," read as a whole, could mean "any and every government"—respondent's backup argument and the one the Court adopts today. *Ante,* at 4. Neither possibility is the slam dunk our familiar clear-statement rule requires. Consider each in turn.

A

Start with the "domestic government" possibility. At the time Congress adopted the provisions of the Bankruptcy Code at issue before us, the word "domestic" carried only two potentially relevant meanings. It could mean *spatially* domestic—*i.e.,* within the territorial confines of the United States. Or it could mean *politically* domestic—*i.e.,* a subpart of the United States. Contemporary definitions support each of those possibilities and only those possibilities. See, *e.g.,* Random House Dictionary of the English Language 581 (2d ed. 1987) ("of or pertaining to one's own or a particular country as apart from other countries"); American Heritage Dictionary 416 (2d College ed. 1982) ("[o]f or pertaining to a country's internal affairs").

If we were to read the term only in its spatial sense, as the First Circuit did below and respondent urges us to do, it makes some sense to speak of Tribes as "domestic." See *In re Coughlin*, 33 F. 4th 600, 606 (2022). These days, tribal jurisdiction usually falls within the United States' territorial bounds—although that was not true for most of the Nation's history, and became so only after the West was won. M. Fletcher, Tribal Consent, 8 Stan. J. Civ. Rights & Civ. Lib. 45, 55, n. 63 (2012). Of course, usually does not mean always. Even to this day, all three branches of government struggle to address the status of Tribes that straddle our Nation's borders. See, *e.g.,* 8 U. S. C. §1359 (setting special immigration rules for "American Indians born in Canada"); 22 CFR §42.1(f) (2022) (similar); *Matter of Yellowquill*, 16 I. & N. Dec. 576, 577–578 (BIA 1978) (interpreting other

provisions to not apply to Canada-born "American" Indians); *Akins* v. *Saxbe*, 380 F. Supp. 1210, 1218–1222 (Me. 1974) (similar). Evidently, our neighbor to the north has encountered similar difficulties. See *R.* v. *Desautel*, 2021 SCC 17 (analyzing traditional cross-border hunting rights).

Focusing only on the spatial meaning of "domestic," however, would miss an obvious point. When it comes to the status of governments, this Court has long recognized that geography takes a backseat. Whether a government qualifies as "domestic" instead usually depends on "the political relation in which one government or country stands to another"; the term has "no relation to local, geographical, or territorial position." *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 55 (1831) (Thompson, J., dissenting); see also *id.,* at 16–20 (Marshall, C. J., for the Court). At minimum, this line of thinking leaves open a reasonable possibility that Congress in §101(27) meant the term "domestic" in its political (not geographic) sense. Accordingly, for respondent's primary argument to succeed, he must show that the *political* relationship between Indian Tribes and the United States is such that the term "domestic government" *clearly* covers them.

That is a burden respondent cannot carry. Properly understood, Indian Tribes "occupy a unique status" that is neither politically foreign nor domestic. *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 851 (1985). Significant evidence supports this understanding. Start with the text of the Constitution. Its terms appear to "place Indian [T]ribes in an intermediate category between foreign and domestic states." Z. Price, Dividing Sovereignty in Tribal and Territorial Criminal Jurisdiction, 113 Colum. L. Rev. 657, 670 (2013) (Price). At least two provisions illustrate as much. One is the Commerce Clause, which gives Congress the power to regulate "Commerce" "with foreign Nations," "among the several States," and "with the Indian

GORSUCH, J., dissenting

Tribes." Art. I, §8, cl. 3. The inclusion of that third Commerce Clause power suggests that Tribes were not reachable either by Congress's foreign commerce power or by its domestic (interstate) commerce power. More obscure but no less probative is the Constitution's exemption from the apportionment formula of all "Indians not taxed." Art. I, §2, cl. 3; Amdt. 14, §2. That choice recognizes that Tribes are not fully "domestic" to the United States, and instead stand "separate from the polity." Price 670.

These provisions, too, reflected a widely shared understanding about the sovereign status of Tribes at the founding. As Secretary of War Henry Knox put it in a letter to President Washington, the Tribes were in many ways akin to "foreign nations," and not part "of any particular [S]tate." Letter to G. Washington (July 7, 1789), in 3 Papers of George Washington: Presidential Series 134, 138 (D. Twohig ed. 1989). Consistent with this understanding, before 1871 the United States (and, prior to that, Great Britain) chiefly managed tribal relations by way of treaty. Entering into those treaties "admit[ted]" that the Tribes "rank among those powers who are capable of making treaties." *Worcester*, 6 Pet., at 559. Governments do not normally deal with politically "domestic" authorities in that manner. See, *e.g., Ex parte Crow Dog*, 109 U. S. 556, 572 (1883) (linking Tribes' "'capacity to make treaties'" with their unique "'semi-independent'" status, allowing them to control "'their domestic government'" (quoting *United States* v. *Joseph*, 94 U. S. 614, 617 (1877))); *The Cherokee Tobacco*, 11 Wall. 616, 622 (1871) (Bradley, J., dissenting) (similar).

This Court's earliest Indian-law jurisprudence offers more evidence along the same lines. In *Cherokee Nation* v. *Georgia*, "three distinct views of tribal sovereignty emerged" on the question whether, "for purposes of Article III," the Cherokee Nation was a "foreign nation." R. Tsosie, Tribalism, Constitutionalism, and Cultural Pluralism: Where Do Indigenous Peoples Fit Within Civil Society?, 5

U. Pa. J. Const. L. 357, 360–361 (2003).  In the lead opinion
for the Court, Chief Justice Marshall emphasized that
"[t]he condition of the Indians in relation to the United
States is perhaps unlike that of any other two people in ex-
istence."  5 Pet., at 16.  For the limited purposes of Arti-
cle III, Chief Justice Marshall rejected the view that the
Tribes could, "*with strict accuracy*, be denominated foreign
nations."  *Id.*, at 17 (emphasis added).  Instead, he sug-
gested, "[t]hey may, *more correctly, perhaps*, be denomi-
nated domestic dependent nations."  *Ibid.* (emphasis
added).  But notably, he did not describe the Tribes as "do-
mestic" for all purposes.  To the contrary, he deliberately
chose the term *nations*, stressing also that "[i]n the general,
nations not owing a common allegiance are foreign to each
other."  *Id.*, at 16.  In that way, he said, "the relation of the
Indians to the United States is marked by peculiar and car-
dinal distinctions which exist no where else."  *Ibid.*  Read in
context, the term "domestic dependent nations" is really a
term of art meant to capture Tribes' "hybrid position" be-
tween "foreign and domestic states."  Price 670.

   The remaining opinions in *Cherokee Nation* underscore
this message.  Justice Johnson, concurring, rejected the
moniker "foreign state."  5 Pet., at 27.  But he also thought
it "very clear that the [C]onstitution neither speaks of"
Tribes "as [S]tates or foreign states, but as just what they
were, Indian [T]ribes; an anomaly unknown to the books."
*Ibid.*  Justice Baldwin, also concurring, rejected the
idea that Tribes were "states, foreign *or* domestic."  *Id.,* at 43
(emphasis added).  And Justice Thompson, joined by Justice
Story, dissented on the grounds that he thought the Chero-
kee had a chiefly "*foreign* character," all things considered.
*Id.,* at 55.  All told, this Court split sharply as to the best
way to characterize the legal status of Tribes in relation to
the United States. But if there is one thing all Members of
the Court could have agreed on, perhaps it would be this:

GORSUCH, J., dissenting

Neither the term "foreign government" nor the term "domestic government" adequately captures the Tribes' unique legal and political status.

This Court's later decisions only give further reason to doubt that Tribes are clearly "domestic government[s]." No less than this Court's first case analyzing tribal sovereign immunity, *Parks* v. *Ross*, rested on the view that each Tribe remains "in many respects" (but not all) "a *foreign* and independent nation." 11 How., at 374 (emphasis added); see Wood 1640 (describing *Parks* as "the first case of record involving tribal immunity"). That language not only weighs against treating Tribes as domestic governments. It does so in *precisely* the context at issue here—sovereign immunity. If we can assume that Congress "is aware of this Court's relevant precedents," the notion that the Bankruptcy Code abrogates tribal sovereign immunity is sunk. *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. ___, ___ (2022) (slip op., at 13). That seems like an especially safe assumption here, given that Congress adopted its most recent version of §106 after this Court—twice—held that the provision failed our clear-statement rule as to other sovereigns. See *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 33–39 (1992); *Hoffman* v. *Connecticut Dept. of Income Maintenance*, 492 U. S. 96, 98–104 (1989) (plurality opinion). That the respondent in this case nowhere discussed *Parks* in his briefing (and had nothing to say about it at argument, see Tr. of Oral Arg. 43) speaks volumes.

Of course, respondent has bigger problems than just the *words* this Court has used. He must contend with the reality of this Court's Indian-law jurisprudence, which in practice has consistently treated Tribes as a "constitutional hybrid, resembling [S]tates in certain respects and foreign nations in others." Price 670–671; see generally G. Ablavsky, Sovereign Metaphors in Indian Law, 80 Mont. L. Rev. 11 (2019). For example, while Congress has certain legislative authority over tribal lands, the Tribes themselves

need not abide by the Bill of Rights or the Fourteenth
Amendment.  See *Oliphant* v. *Suquamish Tribe*, 435 U. S.
191, 194, n. 3 (1978) (citing *Talton* v. *Mayes*, 163 U. S. 376
(1896)).  Instead, they are governed by unique regimes of
civil and criminal jurisdiction involving overlapping "fed-
eral, tribal, and state authorities" unlike those employed
anywhere else.  *Oklahoma* v. *Castro-Huerta*, 597 U. S. ___,
___, and n. 3 (2022) (GORSUCH, J., dissenting) (slip op., at
15, and n. 3).  And their unique character makes their
brand of sovereign immunity "not congruent" with the im-
munity other sovereigns enjoy.  *Three Affiliated Tribes*, 476
U. S., at 890.

Nor are Tribes alone in standing outside the foreign/do-
mestic dichotomy.  Take the Court's treatment of the so-
called Insular Territories.  It depends entirely on the idea
that those Territories are neither foreign nor domestic, but
instead unique entities "foreign to the United States, in a
domestic sense."  *Downes* v. *Bidwell*, 182 U. S. 244, 341
(1901) (White, J., concurring); see also C. Burnett & B. Mar-
shall, Between the Foreign and the Domestic: The Doctrine
of Territorial Incorporation, Invented and Reinvented 30,
n. 3, in Foreign in a Domestic Sense: Puerto Rico, American
Expansion, and the Constitution (2001) (noting that the
Court has "unanimously and expressly adopted" that view).
No one could accuse me of having fondness for the Insular
Cases.  See *United States* v. *Vaello Madero*, 596 U. S. ___,
___ (2022) (GORSUCH, J., concurring) (slip op., at 1).  But
their existence is fatal for respondent's theory.  After all,
the Insular Territories are a close comparator to Tribes and
many have considered "both [T]ribes and [T]erritories [to]
share the same status as '"foreign to the United States, in
a domestic sense."'"  H. Babock, A Possible Solution to the
Problem of Diminishing Tribal Sovereignty, 90 N. D.
L. Rev. 13, 57 (2014).  Tellingly, too, Congress *expressly* ab-
rogated any immunity Territories may enjoy under the
Bankruptcy Code. §101(27).  Yet it did no such thing when

GORSUCH, J., dissenting

it came to the Tribes.

Respondent has no real answer to any of this. He cites some cases in which this Court reprised the "domestic dependent nations" language from *Cherokee Nation*. See Brief for Respondent 21 (citing cases). But as we have seen, that language actually stands for a view of Tribes flatly inconsistent with the "domestic government" characterization. Taking away those examples leaves respondent with thin gruel. He directs us to *United States* v. *Coxe*, 18 How. 100, 103 (1856). But that case observed only that "Cherokee *territory*" counts as "domestic *territory*." *Ibid.* (emphases added). The decision thus plainly used the term "domestic" only in its spatial sense. The same goes for *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775 (1991). There, this Court recognized that Tribes are only "in some respects" "more like States than foreign sovereigns." *Id.*, at 782. Read with this context in mind, its statement that "[t]hey are, for example, domestic," referred only to their spatial location. *Ibid.* Confirming this point, the rest of the paragraph contrasted the Tribes' physical "domesticity" with features of their political relationship with the United States. *Ibid.*

More fundamentally, even granting respondent these examples would not do him any good. Just think of the balancing task we would face. On one side of the scale, we would have a couple of scattered quotes (cherry-picked from over two centuries of Indian-law jurisprudence) bandying about the word "domestic" when describing certain *features* of Tribes. On the other side of the scale, we would have the text and history of the Constitution, supported by more (and better) examples of this Court's jurisprudence fashioning rules of law treating Tribes as *sui generis*. Faced with all that countervailing authority, the best respondent could realistically hope for is that we declare §101(27) a jump ball. And under our clear-statement rule, a jump ball is as good as a possession arrow favoring the party opposing the

abrogation of sovereign immunity.

## B

Taking the "domestic government" possibility off the table leaves only one other. Respondent falls back on the idea that "foreign or domestic" is really just shorthand for "every government under the Sun." The Court relies solely on this reading, holding that §102(27) "unequivocally abrogates the sovereign immunity of any and every government that possesses the power to assert such immunity." *Ante,* at 4. Getting to that conclusion from the statutory text requires two interpretive moves. First, the reader must treat the words "foreign or domestic" as a single, undifferentiated clause (rather than as a disjunctive grouping of descriptors). Second, the reader must take that undifferentiated clause to mean "anywhere and everywhere." Each move is plausible; neither is "clear." And a problem with either is game over.

Start with the first move. Respondent would have us read "foreign or domestic" as a unitary clause expressing a single, shared idea. This is what linguists might call a hendiadys—"two terms separated by a conjunction [that] work together as a single complex expression." S. Bray, "Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution, 102 Va. L. Rev. 687, 688 (2016). On occasion, English employs that sort of construct. But those occasions are the exceptions, not the rule. Nor is it clear that is what we have here. As even respondent concedes, "or" in "its ordinary use" instead indicates that "'the words it connects are to "be given separate meanings."'" Brief for Respondent 23 (quoting *United States* v. *Woods*, 571 U. S. 31, 45–46 (2013)). A perfectly natural reading, then, would ask whether Tribes clearly qualify as "foreign . . . government[s]" *or* as "domestic government[s]." And because the answer is "no" on both scores (for the reasons already laid out above) the language flunks the clear-statement rule.

The second move has issues too. The case for treating

GORSUCH, J., dissenting

"foreign or domestic government" as synonymous with "any government anywhere" rests on the premise that the terms are "two extremes," so that—by invoking both—Congress meant to cover every part of an all-inclusive spectrum. *Ante,* at 5. The Court analogizes to the phrase "near and far," which it argues sometimes means "all over the map." *Ante,* at 5–6. But the premise here is faulty and the analogy inapt. "Near" and "far" may well be "two extremes"—one would not speak of a location being *both* near *and* far at the same time, for example. When it comes to sovereigns, however, the terms "foreign" and "domestic" do not share that same quality. Rather, as we have seen, an extensive tradition supports treating certain sovereigns—Tribes among them—as *sui generis* entities falling outside the foreign/domestic dichotomy. That tradition is fatal under the clear-statement rule.

How does respondent contend with this problem? At argument, he retreated from his briefing and relied instead on a provision of the Bankruptcy Code stating that, for purposes of that Code, "'or' is not exclusive." Tr. of Oral Arg. 41 (citing §102(5)). From this, respondent reasoned, the Bankruptcy Code abrogates tribal immunity because everyone can agree at least that Tribes bear *some* qualities of both foreign *and* domestic governments.

The provision respondent cites simply does not do what he seems to think it does. In common usage, the term "or" can carry two meanings. The first is exclusive. It requires full satisfaction of one—and exactly one—listed condition. The second is inclusive. It requires full satisfaction of at least one listed condition. All §102(5) does is favor the latter meaning for purposes of the Bankruptcy Code. Sound complicated? Just look at an example. Suppose you tell your child that he can get a pet so long as it is "small or a dog." The child can choose a small animal (like a hamster) or a large dog (like a mastiff). But can the child also choose a small dog? If the "or" is inclusive (as respondent argues

it is here), the answer is "yes." If it is exclusive, the answer is "no." Critically, however, neither reading covers a medium-sized aardvark. Such an animal may be *somewhat* small and *somewhat* doglike, but two near misses do not add up to a hit. This is a simple point but an important one. Regardless of whether "or" is used inclusively or exclusively, *one* of the input conditions must be satisfied.

With this point in mind, respondent's reading collapses. To see why, consider another example. Suppose you are a houseguest, and your host invites you to "help yourself to the chocolate or vanilla ice cream in the freezer." Upon opening the freezer, you find three tubs—vanilla, chocolate, and Neapolitan. For argument's sake, too, let's say the last tub also has a sticky note: "Do not eat without clear permission." Which ice cream can you take? If the host meant "or" exclusively, you may take *either* chocolate or vanilla, not both. If the host meant it inclusively, you may scoop some of each. In neither event, however, would you have permission to take the Neapolitan ice cream—especially given the cautionary note. As a unique composite, it does not clearly satisfy either of the necessary conditions. So too here. Tribes may have *some* features of both domestic and foreign governments, but they do not clearly qualify as either, and they have some features found in neither. Accordingly, §102(5) does nothing to rescue respondent's cause.

If anything, §102(5) only sheds light on what the catchall term "other foreign or domestic government" does cover. That phrase sweeps up, as Chief Judge Barron explained in dissent below, certain "otherwise excluded, half-fish, half-fowl governmental entities like authorities or commissions that are created through interstate compacts" ("'other . . . domestic government[s]'") and "the joint products of international agreements" ("'other foreign . . . government[s]'"). 33 F. 4th, at 615. Without the catchall, entities of these sorts could potentially fall through the cracks. Tribes, by contrast, are among the most significant entities wielding

GORSUCH, J., dissenting

sovereign immunity. They are a unique form of government—and they alone are nowhere mentioned.

The Court offers two responses. Above the line, it asks why Territories are encompassed within §101(27)'s immunity-abrogation provision if they share the same status of Tribes—neither foreign nor domestic. *Ante*, at 13. The answer, of course, is that Congress *expressly listed* Territories; it did not do the same for Tribes. Nor do I see how Congress's choice to include Territories supports the Court's suggestion that the term "other foreign or domestic government" *clearly* covers all governments. To the contrary, under the Court's interpretation of that term, the express inclusion of Territories becomes curious surplusage. And to the extent the Court thinks Congress mentioned Territories just to be doubly clear that the term "other foreign or domestic government" really does cover *all* governments—adopting a kind of belt-and-suspenders approach—isn't it odd that Congress left one of the most notable types of sovereigns (a key part of its "belt") at home?

Below the line, the Court simply asserts (without analysis or support) that "the terms 'foreign' and 'domestic' are two poles on a spectrum." *Ante,* at 12–13, n. 7. It does not grapple, however, with the many decisions of this Court discussed above that contradict that premise—and that do so in the precise context of Indian law (in general) and sovereign immunity (in particular). See *supra*, at 6–11. Nor does it grapple with the reality that, even if the terms were two poles on a spectrum, many Justices of this Court have suggested that Indian Tribes do not fall along that continuum at all and are instead "just what they [are], Indian [T]ribes." *Cherokee Nation*, 5 Pet., at 27 (Johnson, J., concurring). Others of course have disagreed. But that disagreement is no help to the Court under our clear-statement rule. It is dispositive the other way.

### III

Unable to demonstrate that the statute's terms clearly abrogate tribal immunity, respondent and the Court stress that §101(27) as a whole "exudes comprehensiveness." *Ante,* at 5. That is obviously true but not obviously helpful. Really, the express inclusion of so many other types of sovereigns in the Bankruptcy Code's abrogation provision only deepens the mystery why Tribes are nowhere mentioned. Normally, after all, when Congress includes so many items within "'[an] associated group,'" we assume the omission of another means that it has been deliberately "'exclude[d].'" *Chevron U. S. A. Inc.* v. *Echazabal*, 536 U. S. 73, 80 (2002). Nor, for that matter, has this Court ever held that a statute's general atmospherics can satisfy the clear-statement rule when the text itself comes up short.

The Court also invokes the Bankruptcy Code's purposes. It contends that Congress designed the Code in part to "offe[r] debtors a fresh start," that its provisions were intended to "sweep broadly," and that petitioners' view of the statute could "upen[d] the policy choices that the Code embodies." *Ante,* at 6–8. In a similar vein, the Court wonders what reason Congress possibly could have had for excluding Tribes from its abrogation provision. *Ibid.* These are fair questions and concerns. Some of them I share. But they, too, have no place in a case like this one. For purposes of satisfying a clear-statement rule, attempts to "construe" §106 "in light of the policies underlying the Bankruptcy Code are unavailing." *Hoffman*, 492 U. S., at 104 (plurality opinion). Perhaps Members of Congress had good reasons for failing to include Tribes in §101(27). Perhaps their decision reflected a measured political compromise. Or perhaps the issue of tribal immunity simply never came up. In all events, the result is the same. Absent some clear textual indication, there can be no abrogation.

Setting aside those policy concerns leaves the Court with a methodological one. It fears adopting my approach could

GORSUCH, J., dissenting

transmute our clear-statement rule into some sort of magic-words test. *Ante*, at 10. I do not see how it could. Congress could identify Tribes in any number of unmistakable ways—"Indians," "Native Americans," "Indigenous Peoples," or even (as we have seen) "domestic dependent nations." Congress has had no trouble using language like that in plenty of other statutory contexts. See, *e.g.,* 7 U. S. C. §8310; 42 U. S. C. §8802(17); 49 U. S. C. §5121(g). Alternatively, Congress could identify Tribes by description—for instance, "any other government that operates, in whole or in part, within the territorial bounds of the United States." See 33 F. 4th, at 622 (Barron, C. J., dissenting). Alternatively still, Congress could abrogate *all* sovereign immunity through some unequivocal statement to that effect—using, for example, the Court's own formulation, "any and every government." *Ante*, at 4. The only thing Congress cannot do is use "oblique or elliptical language" to "supply a clear statement." *West Virginia* v. *EPA*, 597 U. S. ___, ___ (2022) (GORSUCH, J., concurring) (slip op., at 13) (internal quotation marks and alterations omitted). Because that is—at best—what the Bankruptcy Code provides, I respectfully dissent.